**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AMERICAN TRUCKING ASSOCIATIONS, INC.,
              *Plaintiff-Appellant,*

              v.

THE CITY OF LOS ANGELES; THE
HARBOR DEPARTMENT OF THE
CITY OF LOS ANGELES; THE
BOARD OF HARBOR
COMMISSIONERS OF THE CITY OF LOS
ANGELES; THE CITY OF LONG
BEACH; THE HARBOR
DEPARTMENT OF THE CITY OF LONG
BEACH; THE BOARD OF HARBOR
COMMISSIONERS OF THE CITY OF
LONG BEACH,
              *Defendants-Appellees,*

NATURAL RESOURCES DEFENSE
COUNCIL; SIERRA CLUB;
COALITION FOR CLEAN AIR, INC.,
   *Defendant-intervenors-Appellees.*

No. 08-56503

D.C. No.
2:08-CV-04920-
CAS-CT

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
March 4, 2009—Pasadena, California

Filed March 20, 2009

Before: Robert R. Beezer, Ferdinand F. Fernandez, and
Richard A. Paez, Circuit Judges.

3567

Opinion by Judge Fernandez

## COUNSEL

Christopher C. McNatt Jr., Scopelitis, Garvin, Light, Hanson & Feary, LLP, Pasadena, California; Robert Digges, American Trucking Associations, Inc., Arlington, Virginia, for the plaintiff-appellant.

C.Jonathan Benner, Troutman Sanders, LLP, Washington, DC; Steven S. Rosenthal, Kaye Scholer LLP, Washington, DC, for the defendants-appellees.

David Pettit, Natural Resources Defense Council, Santa Monica, California, for the intervenors-appellees.

Karyn A. Booth, Thompson Hine LLP, Washington, DC, for the amicus, The National Industrial Transportation League.

Melissa N. Patterson, Department of Justice, Appellate Staff Civil Division, Washington, DC, for the amicus, the United States of America.

Timothy R. Patterson, Office of the Attorney General of California, Oakland, California, for the amicus, the State of California.

Jeffrey Bossert Clark, Kirkland & Ellis, LLP, Washington, DC, for the amicus, National Association of Waterfront Employers.

## OPINION

FERNANDEZ, Circuit Judge:

### INTRODUCTION

American Trucking Associations, Inc. ("ATA"), a non-profit national trade association for the trucking industry, appeals from the district court's refusal to preliminarily enjoin the implementation of mandatory concession agreements for drayage trucking services at the Port of Los Angeles[1] and the Port of Long Beach[2] (together the "Ports"). ATA sought to enjoin the programs as preempted by the Federal Aviation Administration Authorization Act, 49 U.S.C. § 14501(c) (the "FAAA Act"), because they improperly attempted to regulate the "price, route, or service of any motor carrier." 49 U.S.C. § 14501(c)(1). The district court concluded that the agreements likely fell within a statutory exception preserving the "safety regulatory authority of a State with respect to motor vehicles." *Id.* § 14501(c)(2)(A). It also concluded that ATA failed to demonstrate irreparable harm absent an injunction and that the balance of hardships and public interest weighed against imposing an injunction.[3] We reverse and remand.

### BACKGROUND

The Ports of Los Angeles and Long Beach are contiguous and effectively form a single port on San Pedro Bay bisected by the Los Angeles-Long Beach city boundary. They occupy

---

[1]The Port of Los Angeles is owned and operated by the City of Los Angeles, and management is vested in the Board of Harbor Commissioners of the City (the Los Angeles Board).

[2]The Port of Long Beach is owned and operated by the City of Long Beach, and management is vested in the Board of Harbor Commissioners of the City (the Long Beach Board).

[3]*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 577 F. Supp. 2d 1110 (C.D. Cal. 2008) (*Am. Trucking I*).

land that was granted by the State of California to the Cities of Los Angeles and Long Beach via the California Tidelands Act, and the Ports hold the land in trust for the benefit of the people of California. Each Port is managed by its respective Board of Harbor Commissioners. The Ports act as "landlords" by developing terminal facilities that are then leased to shipping lines and stevedoring companies. The Ports' revenue comes from fees those operators pay to occupy port space.

The Port of Los Angeles handles more containerized cargo than any other domestic port and the two ports combined handle over 40% of the containerized goods in United States foreign commerce. Motor carriers,[4] like the constituents of ATA (which has tens of thousands of affiliated members), dray this cargo from ships to customers, to off-dock terminals, or to railheads for further transport. Motor carriers do not contract with the Ports; instead, they contract directly with end-users, ocean carriers, railroads, or others in the transport chain. ATA members rely largely on independent truck owner-operators as subcontractors to provide drayage at the Ports. One Port study estimated that 85% of drayage drivers are independent contractors, rather than employees, and ATA estimates that number as closer to 98%.

Each Port's respective Drayage Services Concession Agreement ("Concession agreement") requirements went into effect on October 1, 2008, as part of the Ports' Clean Trucks Program. The Program is composed of three main parts: (1) a progressive truck ban that prohibits pre-1989 trucks; (2) the Concession agreements; and (3) a container fee to finance the billions of dollars necessary to subsidize modernizing the truck fleet. The Los Angeles Board's tariff Order No. 6956,

---

[4]A "motor carrier" is an individual, a partnership, or a corporation engaged in the transportation of goods; those engaged in interstate commerce are subject to, *inter alia*: Department of Transportation regulations; the Motor Carrier Acts, *see, e.g.*, 49 U.S.C. § 13902; and the Motor Carrier Safety Acts, *see, e.g.*, 49 U.S.C. §§ 31136, 31142.

adopted at the same time as the resolution approving the Los Angeles Port Concession agreement, states that the Concession agreement was designed to:

> (a) further the improvement of air quality at the Port, (b) create an efficient, reliable supply of drayage services to the Port for the sustainable future, (c) establish performance criteria for providers of drayage services that promote the Port's business objectives, (d) ensure sufficient supply of drayage drivers, by improvement of wages, benefits, and working conditions, (e) enhance Port security and safety, and (f) reduce negative impacts on the local community.

The Ports admit that environmental concerns were the "principal motivating factor" of the Clean Trucks Program.[5]

Though similar, the Concession agreements differ in some respects. The Port of Los Angeles Concession agreement requires that motor carriers: (1) remain licensed and in good standing while operating at the Port; (2) enter, verify, and update identifying information for each truck and driver; (3) ensure that permitted trucks are equipped with a Radio Frequency Identification Device to be read when a truck enters a terminal; (4) transition over the course of five years from independent-contractor drivers to employees of each licensed motor carrier;[6] (5) provide off-street parking outside the Port; and (6) submit a maintenance and parking plan for each truck. Each permitted motor carrier must also comply with federal and state law, must obtain automobile liability insurance and worker's compensation insurance, and must agree to safety and security inspections and audits and file numerous reports.

---

[5]Intervenor-Appellee Natural Resources Defense Council, Inc. ("NRDC") chronicles at length the environmental purposes of the Concession agreements, i.e., to protect the "public health."

[6]The City of Los Angeles Concession agreement requires at least a 20% transition by the end of the fourth quarter of 2009.

Each carrier must pay an initial $2,500 concession fee and a $100 annual administration fee per truck.

The Concession agreement for the Port of Long Beach requires that permitted motor carriers: (1) comply with state and federal law; (2) enter and update information for trucks and drivers; (3) ensure that permitted trucks are equipped with a Radio Frequency Identification Device; (4) provide proof that it informs drivers of available health insurance; (5) ensure that drivers properly maintain trucks and comply with laws regulating on-street parking and truck routes; (6) maintain general liability and automobile liability insurance; (7) permit safety and security inspections; (8) must agree to audits and file numerous reports; and (9) pay an initial $250 fee and $100 annual fee per truck. The Concession agreement for the Port of Long Beach does not include the provision requiring transition from independent contractors to employee-drivers. Nor does it require off-street parking of trucks.

Both agreements require motor carriers to give hiring preferences to drivers with port service histories and post openings with the Ports' Workforce Development Office. Both agreements require financial disclosures: They compel publicly held companies to disclose annual reports, SEC filings, and pending legal actions, and privately held companies to disclose balance sheets, income tax statements, and pending legal actions.

The Ports claim that the Concession agreements address security concerns. For example, the Ports say that they have little good information on trucks and drivers, and the driver and truck tracking measures address that gap. In the promulgation history of the Clean Trucks Program, the Los Angeles Board stated that the Concession agreement requirement was "designed to assure ongoing safety [and] security" and would yield "increased safety and security [through] accountability and control of the Concessionaires as employers of their employee drivers to a degree not possible with casual or inde-

pendent drivers . . . ." Los Angeles Board Resolution 6522. The Port of Los Angeles's Deputy Executive Director stated:

> [T]he drayage concession contracts provide the Port with the tools to better secure itself from threats involving the use of heavy-duty trucks as a means to transport illicit or dangerous materials into or out of the Port. The concession contracts enhance Port security by contractually allowing [the Port of Los Angeles] to: (1) collect identifying information for the driver, the truck, the cargo, and the responsible company for each truck entering [the Port's] terminals; (2) correlate each piece of information with the other pieces for a given truck visit; and (3) make one entity, the [motor carrier], which is the entity coordinating drayage truck movements, wholly responsible for providing the information and verifying its accuracy.

The Los Angeles Board included the independent contractor phase-out based on stated concerns that "[s]erious and long-standing safety problems also exist as a consequence of unsafe, negligent or reckless driving of trucks on the Port or on public roads and highways accessing the Port," and seeks to shift the access and identity tracking to motor carriers because it is "more practical and effective to require that motor carriers enforce such requirements against their own drivers." Los Angeles Board Resolution 6522. The Board justified the parking restrictions on residential streets because "truck traffic through the nearby neighborhoods has subjected neighborhood residents to adverse impacts from high levels of air pollution, noise, and safety hazards," which would allegedly be "substantially reduced" if drayage trucks "were required to park in designated truck parking areas that are physically separated from residential areas." *Id.*

ATA points out that the actual alleged "safety" features of the Concession agreements are duplicative of requirements

already imposed by federal and state law, such as tracking driver information in the Drayage Truck Registry, ensuring compliance with state and federal safety standards, keeping driver records in the federal Transportation Worker Identification Credential ("TWIC") program, and ensuring compliance with state and federal security requirements. ATA does not object to the purport of those elements. ATA's objection lies with the additional components of the Concession agreements, which the Los Angeles Board at one point described as creating a "market characterized by the presence of fewer, generally larger and more stable" licensed motor carriers. Los Angeles Board Resolution 6522.

ATA filed this action on July 28, 2008, claiming that the FAAA Act preempted the Concession agreements[7] and that the agreements unduly burdened interstate commerce in violation of the Commerce Clause.[8] Soon thereafter, ATA filed a motion for a preliminary injunction to stop the Ports' enforcement of the Concession agreement programs (due to take effect on October 1, 2008). ATA asserted the ground of preemption. The district court declined to issue a preliminary injunction. First, in a ruling left unchallenged in this appeal, the district court held that ATA could likely demonstrate that the Concession agreements "related to a price, route, or service" of motor carriers and thus, unless saved by an exception, were preempted by the FAAA Act. *See* 49 U.S.C. § 14501(c)(1). However, without addressing each specific provision of the Concession agreements, the district court

---

[7]As relevant here, the FAAA Act provides:

> [A] State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

49 U.S.C. § 14501(c)(1).

[8]U.S. Const. art. I, § 8, cl. 3.

held that ATA would not likely show that the agreements were unrelated to regulating the safety of motor carriers, so the agreements were saved by § 14501(c)(2)(A).[9] The district court did find that ATA would likely demonstrate that the Ports were not acting as market participants by implementing the Concession agreements. However, it also concluded that ATA could not demonstrate irreparable harm and that the balance of hardships and the public interest weighed against issuing an injunction.

As of October 1, 2008, any motor carrier out of compliance with a Port's Concession agreement has been barred from entering that Port. ATA claims its members will suffer short-term and long-term capital losses and injuries to business goodwill. Still, some motor carriers have, in fact, entered into Concession agreements.

## JURISDICTION AND STANDARDS OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

We review the grant or denial of a preliminary injunction for abuse of discretion. *Lands Council v. Martin*, 479 F.3d 636, 639 (9th Cir. 2007). Our review is " 'limited and deferential,' and '[w]e do not review the underlying merits of the case.' " *Id.* Nevertheless, a district court " 'necessarily abuses

---

[9]That subsection provides that the preemption provision

shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.

49 U.S.C. § 14501(c)(2)(A).

its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact.' " *Id.* Stated differently, " '[a]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case.' " *Wildwest Inst. v. Bull*, 472 F.3d 587, 590 (9th Cir. 2006).

We review the district court's decision regarding preemption and its interpretation and construction of a federal statute de novo. *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1186 (9th Cir. 1998); *Tocher v. City of Santa Ana*, 219 F.3d 1040, 1045 (9th Cir. 2000), *abrogated on other grounds by City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 431-32, 122 S. Ct. 2226, 2232, 153 L. Ed. 2d 430 (2002).

## DISCUSSION

**[1]** As we have already noted, the question before us is whether we should overturn the district court's denial of a preliminary injunction to ATA. In so doing, we must follow the Supreme Court's recent expatiation on the proper standard for granting or denying that form of relief. *See Winter v. Natural Res. Def. Council, Inc.*, ___ U.S. ___, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). In *Winter*, the Court reversed one of our decisions, which, it determined, upheld a grant of a preliminary injunction by use of a standard that was much too lenient. *Id.* at ___, 129 S. Ct. at 370. As the Court explained, an injunction cannot issue merely because it is possible that there will be an irreparable injury to the plaintiff; it must be likely that there will be. *Id.* at ___, 129 S. Ct. at 375. It drove that point home when it said: "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at ___,

129 S. Ct. at 375-76. The Court succinctly stated the rule to be as follows:

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Id.* at ___, 129 S. Ct. at 374.

**[2]** To the extent that our cases have suggested a lesser standard,[10] they are no longer controlling, or even viable. The district court applied our pre-*Winter* approach, but because it denied relief that, itself, does not require reversal.

That said, we will now consider the question of whether the Ports' decisions to force motor carriers into the Concession agreements will likely fall before the demands of federal preemption as set forth in the FAAA Act. 49 U.S.C. § 14501(c)(1).[11]

## I.    Likelihood of Success on the Merits.

The Supremacy Clause provides that: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . ." U.S. Const. art. VI, cl. 2. State laws that "interfere with, or are contrary to, federal law" are, therefore, invalidated. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1039 (9th Cir. 2007) (internal quotation marks omitted).

---

[10]*See, e.g.*, *Lands Council*, 479 F.3d at 639.

[11]We decline to consider the amicus brief of National Association of Waterfront Employers, which seeks to raise issues not raised or briefed by the parties, *see Day v. Apoliona*, 496 F.3d 1027, 1035 n.11 (9th Cir. 2007), and order it stricken.

**[3]** There can be no doubt that when Congress adopted the FAAA Act, it intended to broadly preempt state laws that were "related to a price, route or service" of a motor carrier. 49 U.S.C. § 14501(c)(1). In so doing, Congress intended to avoid the spectacle of state and local laws reregulating what Congress had sought to deregulate. *See Rowe v. N.H. Motor Transp. Ass'n*, ___ U.S. ___, ____, 128 S. Ct. 989, 996, 169 L. Ed. 2d 933 (2008). And, as we have said, "A state or local regulation is related to the price, route, or service of a motor carrier if the regulation has more than an indirect, remote, or tenuous effect on the motor carrier's prices, routes or services." *Tocher*, 219 F.3d at 1047. That the Concession agreements relate to prices, routes or services of motor carriers can hardly be doubted. Thus, we fully agree with the district court that it is likely that ATA will establish that proposition. *See Am. Trucking I*, 577 F. Supp. 2d at 1116-18. In fact, the Ports do not actually dispute that on appeal.

**[4]** As the district court recognized, that demonstrates a likelihood that ATA will succeed on the merits unless some exception to preemption applies here. We are satisfied that it is likely that no exception applies.

A.  *The Non-Statutory Claims.*

The Ports claim that their far-reaching Concession agreements are not preempted because the Ports own the port land; or because they are acting as market participants, even though they are not buyers or sellers of drayage services; or because it is a matter of efficient procurement, even though they do not procure drayage services; or because, despite the breadth of the regulations they seek to impose on the industry, the Concession agreements are narrow in scope.

We agree with the district court that it is likely that ATA will prevail on those points, and we commend the district court's cogent explanation to the reader of this opinion. *See id.* at 1118-1123.

B.  *The Statutory Exception.*

**[5]** As we noted previously, there is a statutory exception to preemption in this area, that is the preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles . . . ." 49 U.S.C. § 14501(c)(2)(A). That leaves room for some state regulation, but any regulation must be "genuinely responsive to safety concerns." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 442, 122 S. Ct. 2226, 2237, 153 L. Ed. 2d 430 (2002); *see also Tillison v. City of San Diego*, 406 F.3d 1126, 1129 (9th Cir. 2005). This standard requires that we consider intent. We must ask if the regulator "was acting out of safety concerns." *Tillison*, 406 F.3d at 1129. That is, we must consider whether the purpose and intent was "truly safety." *Id.* But that does not mean that we are required to take the regulator at its word; we need to go further with the analysis. *See Tillison v. Gregoire*, 424 F.3d 1093, 1104 (9th Cir. 2005). We must still decide whether the regulation is genuinely responsive to safety concerns. *See Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 145-47 (2d Cir. 2006).

Moreover, even if some kind of general public health concerns are (or may be) involved in a statute or regulation — for example control of cigarette usage — that alone does not bring the regulation within the ambit of the motor vehicle safety exception. *See Rowe*, ___ U.S. at ___, 128 S. Ct. at 996-97. Indeed, if too broad a scope were given to the concept of motor vehicle safety, the exception would swallow the preemption section itself or, at the very least, cut a very wide swath through it.

While there is no bright line test for what is related to vehicle safety, cases to date do give some guidance in that regard. As we have already noted, the Supreme Court has declared that a law which required carriers to meet a number of requirements regarding cigarette delivery had a direct effect

on prices and services and was not a regulation of safety. It was preempted. *See id.* at \_\_\_, 128 S. Ct. at 995.

Similarly, when Puerto Rico sought to enforce statutes that imposed a number of controls upon motor carriers associated with air carriers, the First Circuit Court of Appeals determined that they were preempted despite a claim that the controls came within a safety exception similar to (actually the same as)[12] the one at hand. *See United Parcel Serv., Inc. v. Flores-Galarza*, 385 F.3d 9, 13 (1st Cir. 2004). The court said:

> He [the Secretary of the Department of Treasury of the Commonwealth of Puerto Rico] urges us to conclude that statutes that had required carriers to, *inter alia*, keep documents and records required by the Treasury Department, pay license fees, submit copies of their corporate officers' criminal records, and post a bond to secure payment of penalties imposed by the Treasury Department, fall within this savings clause because they are "directed at precluding carriers from engaging or assisting in illegal conduct." This interpretation does not square with the plain language of [the exception], which addresses the regulation of motor vehicles, and the Secretary cites no authority that persuades us otherwise.

*Id.* at 13-14. We note that some of the provisions referred to in *United Parcel Service* are hauntingly similar to some of the requirements that the Ports sought to impose here.

On the other hand, regulation of tow truck services has been found to be within the safety exception on the basis that the statutory provisions were "designed to make the towing and removal of vehicles safer." *Tocher*, 219 F.3d at 1051; *see also Tillison*, 424 F.3d at 1104-05 (same). But an ordinance

---

[12]*See* 49 U.S.C. § 41713(b)(4)(B)(i).

that required tow yards to be within a one-mile radius of the police department was not genuinely responsive to motor vehicle safety concerns. *Loyal Tire*, 445 F.3d at 148. On the contrary, despite its stated safety purpose, the provision in question was designed to exclude out of town businesses from a rotating tow list. *Id.* at 146.

**[6]** Thus, when preemption is claimed, a court must pay careful attention to the particular provisions that a state or local entity seeks to impose upon motor carriers. Moreover, the mere fact that one part of a regulation or group of regulations might come within an exception to preemption does not mean that all other parts of that regulation or group are also excepted. *See Tocher*, 219 F.3d at 1050 (holding that although part of the local law was saved under the municipal-proprietor exception to preemption, the remainder of it was preempted). Were it otherwise, a single valid excepted provision would allow a vast amount of nonexcepted provisions to stand. That is not the law. Unfortunately, the district court seemed to believe it was. That led the district court into error, as we will now explain.

We have already set out the list of purposes alleged to support the requirements of the Concession agreements, and have also synopsized the gallimaufry of individual covenants required of the motor carriers. When a court, as it must, assesses each of those provisions, it must ask whether the " 'purported safety justifications' " will withstand scrutiny. *Auto. Club of N.Y., Inc. v. Dykstra*, 520 F.3d 210, 215 (2d Cir. 2008) (per curiam). It is not enough to say that the provision might enhance efficiency, or reduce some kind of negative health effects. The narrow question, again, is whether the provision is intended to be, and is, genuinely responsive to motor vehicle safety. It is rather clear that some, indeed many, of the provisions of the Concession agreements are not likely to live in the light cast by that strobe.

**[7]** A mere reading of some of the stated purposes of the Los Angeles Board, for example, underscores an extensive

attempt to reshape and control the economics of the drayage industry in one of the largest ports in the nation. One of its goals was to create a market of "fewer, generally larger, and more stable [motor carriers] operating trucks" that may, by adhering to the Ports' emissions requirements, "enjoy competitive advantages if they can earn solid reputations for maintaining green operations." Los Angeles Board Resolution No. 6522. Most notably:

> Maintaining the existing market structure would allow smaller [motor carriers] and [independent contractor-drivers] to maintain unnecessarily dirty operations under the cover of anonymity provided by their large numbers and small size. Requiring that all drivers be employees will also diminish the incentives that smaller [motor carriers] might otherwise have to avoid the true economic costs of their activities, in an effort to compensate for the greater efficiency of larger, more responsible [motor carriers].

*Id.*

The record also demonstrates that another significant purpose behind the Concession agreements was purely environmental. Some trucks entering the Ports are old and polluting, it was said, and the Ports and surrounding areas suffer from serious air pollution. Thus, the Concession agreements sought to ameliorate those adverse environmental effects by forcing a direct contractual relationship upon the motor carriers, by mandating vehicle maintenance requirements, and by enhancing motor carrier efficiency while creating incentives for concessionaires to use clean and efficient trucks.

In pursuit of these objectives, the Port of Los Angeles Concession agreement mandates the phasing out of thousands of independent contractors (many or most of them small businessmen who own their own trucks). In an attempt to justify this, the Port argues that there are "[s]erious and longstanding

safety problems" because of "unsafe, negligent or reckless driving" that has subjected the Port to "a risk of financial liability and moral culpability for failure to act to control actions by third parties." Those concerns would allegedly be ameliorated because requiring employee drivers will provide "control [to] the concessionaires as employers of their employee drivers to a degree not possible with casual or independent drivers." We see little safety-related merit in those thread-paper arguments, which denigrate small businesses and insist that individuals should work for large employers or not at all.

[8] As it is, the record demonstrates that the Ports' primary concern was increasing efficiency and regulating the drayage market. For example, the employee model "is the easiest model to administer" because of the "administrative cost of maintaining up-to-date records" for tens of thousands of independent contractors. Moreover, one of the Port's stated goals was to "ensure sufficient supply of drayage drivers by improvement of wages, benefits, and working conditions." Furthermore, the Port felt that its insistence on that particular employment structure would ensure that the Ports' "investments" in retrofitted trucks "will be better protected" because "Concession motor carriers use only their own employee[s] to drive Port-funded trucks." The Los Angeles Board also sought to alter the allocation of costs. It said that for independent contractors, the costs are externalized, but if they were employees, the costs would be borne by their motor carrier employers. In short, far from regulating motor vehicle safety, "requiring concession motor carriers to use only their own employees for truck drayage at the Port will contribute to the administrative efficiency and reduce the cost of the Clean Truck Program."

[9] Thus, as we see it, the independent contractor phase-out provision is one highly likely to be shown to be preempted. But there are other provisions that are likely to be preempted as well. For example, the job posting and experienced-drivers-first requirement in both Ports' Concession agreements have

little or nothing to do with vehicle safety. Although those provisions might have some slight tendency to ensure that drivers have a proven safety record and can be trusted to conduct business at the Ports, it is likely that the Ports are imposing the requirements in order to force drayage carriers to hire certain preferred workers over others, on the theory that new drivers are not as reliable as old drivers. It is a rather blatant attempt to decide who can use whom for drayage services, and is a palpable interference with prices and services. Neither motor carriers nor their customers (the enormous interstate and foreign shipping industry) would be able to select those with whom they would choose to contract. Port desires for alleged efficiency, not the marketplace, would decide those questions.

Moreover, it is not likely that the financial disclosure requirements in both Ports' agreements could be justified under any conceivable safety rationale. Those provisions require disclosures of annual reports, SEC filings, balance sheets, income tax statements, and pending legal actions. The Ports make no effort to explain how a motor carrier's financial viability touches at all on the safety of the motor vehicle. Similarly, the Port of Long Beach agreement requires motor carriers to notify drivers of available health insurance. Again, this has no discernable safety purpose.

Finally, it is likely that the on-street parking ban in the Port of Los Angeles Concession Agreement is not genuinely responsive to safety. While restrictions on parking could be responsive to the safety of drivers and individuals in the surrounding neighborhoods in some sense (though it is not clear how), the Port of Los Angeles bans trucks from parking legally on streets where other trucks are free to park. Thus, any potential safety rationale for restricting on-street parking is seriously undermined, and it is likely that this provision would not withstand scrutiny. Similarly, just how the Port of Long Beach can set out to regulate compliance with parking

and truck routes which are not on Port property is a bit of a mystery.

**[10]** In short, the district court legally erred in not examining the specific provisions of the Concession agreements, and it is likely that many of those provisions are preempted. The total denial of relief cannot be based on the theory that it is unlikely that ATA will succeed on the merits in those respects at least.[13]

## II.     Likelihood of Irreparable Harm.

Although we are of the opinion that ATA has shown the likelihood that it will prevail on the merits, at least as to some of the provisions of the Concession agreements, it is not entitled to relief unless it can also show the likelihood of irreparable harm. The district court determined that ATA could not do so; we disagree.

The district court correctly noted that the motor carriers had two choices: Sign the Concession agreements, or refuse to sign them. If they sign, said the court, the harm will merely be monetary,[14] and that will not usually support injunctive relief.[15] On the other hand, said the court, if they do not sign,

---

[13]ATA also argues that to the extent the Ports are attempting to regulate motor vehicle safety, that is preempted by California law, which gives the California Highway Patrol exclusive jurisdiction over "the regulation of safety of operation of motor carriers of property." Cal. Veh. Code § 34623(a); *see also* Cal. Veh. Code § 21. There is precious little California authority on the subject. *See* 47 Op. Att'y Gen. Cal. 191, 192 (1966); *see also United States v. Kiliz*, 694 F.2d 628, 630-32 (9th Cir. 1982). Moreover, the Attorney General of the State of California has filed an amicus brief in which he suggests the contrary. We, therefore, are unable to declare at this stage of the proceeding that ATA will likely prevail on that argument. Nor need we.

[14]*Am. Trucking I*, 577 F. Supp. 2d at 1126.

[15]*See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).

any harm is merely speculative,[16] and that, also, will not support injunctive relief, although a loss of goodwill and reputation can do so.[17] We disagree on both counts because it appears that the motor carriers are being put to a kind of Hobson's choice, not entirely unlike that which faced the airlines in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992). There, after deregulation of the airlines, the attorneys general of several states set out to regulate airline advertising and the compensation of passengers who gave up their seats on overbooked flights. *Id.* at 379, 112 S. Ct. at 2034. The Court pointed to the availability of injunctive relief where there was a threat of imminent proceedings by a state of a criminal or civil enforcement nature against parties who were affected by an unconstitutional act. *Id.* at 380-81, 112 S. Ct. at 2035. The Court opined as follows:

> As we have described, the attorneys general of seven States, including petitioner's predecessor, had made clear that they would seek to enforce the challenged portions of the guidelines (those concerning fare advertising) through suits under their respective state laws. And Texas law, at least, imposes additional liability (by way of civil penalties and consumer treble-damages actions) for multiple violations. . . . [R]espondents were faced with a Hobson's choice: continually violate the Texas law and expose themselves to potentially huge liability; or violate the law once as a test case and suffer the injury of obeying the law during the pendency of the proceedings and any further review.

*Id.* at 381, 112 S. Ct. at 2035-36 (citations omitted).

---

[16]*Am. Trucking I*, 577 F. Supp. 2d at 1126-27.

[17]*See Rent-A-Center, Inc. v. Canyon Tele. & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

While the case at hand lacks the precise penalty issues involved in *Morales*, a very real penalty attaches to the motor carriers regardless of how they proceed. That is an imminent harm.

[11] A motor carrier can refuse to sign the likely unconstitutional Concession agreements, and what will ensue, according to the record, is at the very least a loss of customer goodwill — or, indeed, of the carrier's whole drayage business. It is apparent that a carrier could not pick up a customer's goods at the Ports, if it could not even get to those goods. That goodwill would evaporate does not appear speculative at all. In fact, it is likely that all of that part of the carrier's business will evaporate, even if it does other things elsewhere. As to smaller companies that cannot afford the vast increase in capital requirements for the purchase of equipment and personnel expenditures needed to turn independent contractors into employees, the result would likely be fatal. And that means that those smaller carriers, and their employees, and even independent contractors who depend upon them, will be out of work. One wonders why it should be thought that they should just put up with the loss any more than employees of a company should be forced to abide their wrongful termination and the resulting emotional damages and stress that termination causes. *See Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008).

If a motor carrier, however, signs a Concession agreement, or both Concession agreements, its plight is not much better. First, it will have been forced to sign an agreement to conditions which are likely unconstitutional because they are preempted. Second, especially as to the Los Angeles Port Concession agreement, the carrier will be forced to incur large costs which, if it manages to survive those, will disrupt and change the whole nature of its business in ways that most likely cannot be compensated with damages alone. If the Concession agreements were then held to be unconstitutional, it would be faced with either continuing in that form, or, to the

extent it could, unwinding that and returning to the old form. Nor is the fact that the Los Angeles Port Concession Agreement employment provision is scheduled to phase in over a five-year period of any help. Even then, employment must equal twenty percent by the end of 2009, but, as ATA points out, that does not mean that a motor carrier can simply flip a switch at the end of 2009 and have employees rather than independent contractors. It will, instead, be forced into making substantial changes commencing immediately. The same is true of requirements for obtaining parking space, and providing reports and information and the like.

[12] As the above underscores, the Los Angeles Port Concession agreement is the most disruptive and is likely to cause the most harm regardless of which choice a motor carrier makes. The Long Beach Port Concession agreement is less so. Still and all, if rejected by a motor carrier, the carrier will face the problems already noted. If accepted, the agreement will likely force the motor carrier to adhere to unconstitutional conditions and will cause a good deal of economic harm in the interim. But, although there is less disruption, the constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm. The Supreme Court has implied as much. *See Morales*, 504 U.S. at 381, 112 S. Ct. at 2035-36 (referring to the injury from obeying an unconstitutional law); *see also Nelson*, 530 F.3d at 882 (holding that "constitutional violations cannot be adequately remedied through damages"). In short, motor carriers should not be required to adhere to the various unconstitutional provisions in the Ports' agreements, and are likely to suffer irrevocably if forced to do that or give up their businesses.

[13] We end this part of the discussion essentially where we began, but here with a quotation (or with all of the changes we have wrought, really a paraphrase) of what we said in *Nelson*, 530 F.3d at 881-82 (citations omitted):

> Appellants . . . face a stark choice — either violation of their constitutional rights or loss of their [busi-

nesses]. The district court erroneously concluded that Appellants will not suffer any irreparable harm because they could be retroactively compensated for any temporary [loss or expenses]. It is true that "monetary injury is not normally considered irreparable," and the [motor carriers] who choose to give up their [businesses] may later be made whole financially if the policy is struck down. However, in the meantime, there is a substantial risk that a number of [motor carriers] will not be able to finance such a principled position and so will be coerced into submitting to the allegedly unconstitutional [Concession agreements]. Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm. Moreover, the loss of one's [business] does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of [losses].

Therefore, there is a likelihood of irreparable damages in this case.

### III.    Balance of Equities; The Public Interest.

In Part II we have outlined the hardships that motor carriers will suffer if, as is likely, many provisions of the Concession agreements are preempted and are, thus, being imposed in violation of the Constitution.

On the other side, it must be admitted that the Ports do have significant concerns, which cannot be ignored. Still and all, with or without the Concession agreements, many other programs and laws designed to alleviate those problems are in existence and are not challenged. For example: The Drayage Truck Registry program, the Transportation Worker Identification Credential program,[18] the remainder of the Clean

---

[18]33 C.F.R. § 101.514.

Trucks Program, the Port Check program and the PierPass program would not be affected. Nor, of course, would any other general laws regarding anti-terrorism considerations, driving, parking, and the environment be affected. Of course, that does not necessarily mean that the Ports could not seek even more protection in a constitutional manner, but it does mean that the hardship to the Ports will be reduced between now and the final resolution of this litigation.

[14] Based on the above, we are constrained to say that the district court abused its discretion when it determined that the balance of hardships weighed in favor of the Port of Los Angeles and the Port of Long Beach.

[15] Similarly, while we do not denigrate the public interest represented by the Ports, that must be balanced against the public interest represented in Congress' decision to deregulate the motor carrier industry, and the Constitution's declaration that federal law is to be supreme. Again, in light of all we have written above, we determine that the district court did abuse its discretion when it declared that issuing a preliminary injunction as to the Concession agreements would not be in the public interest.

[16] Therefore, at this time and on this record we are satisfied that the balance of equities and the public interest do weigh in favor of a preliminary injunction in this case as to at least portions of the Concession agreements.

IV.    Severance.

While we think it likely that many of the provisions of the Concession agreements will be preempted and should be subject to the strictures of a preliminary injunction, we are not prepared to hold that every provision must be preempted.

As it is, the agreements contain severance provisions[19] and,

---

[19]Each provision appears as Part VIII and reads as follows: "Should any part of this Concession be determined by court or agency of competent

in general, those kinds of provisions are respected. *See, e.g.*, *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1400 (9th Cir. 1991). Thus, we will not direct that the Concession agreements be enjoined in their entirety at this time.

However, we are aware of the fact that if major portions of the agreements are enjoined, it may not be practicable to leave the remaining portions standing. *See United States v. Manning*, 527 F.3d 828, 840 (9th Cir. 2008) (statute had a savings clause, but because the "most significant" parts were excised, the whole was preempted); *see also Nat'l Adver. Co. v. City of Orange*, 861 F.2d 246, 250 (9th Cir. 1988) (partial invalidation of ordinance was appropriate based on the intent of the City and the fact that the remainder of the ordinance could still "function effectively").

**[17]** We, therefore, leave it to the district court on remand to determine whether a preliminary injunction should run against all or only a portion of each Concession agreement.

## CONCLUSION

We conclude that the Concession agreements of both the Ports will likely be found to be preempted in whole or in part. The Port of Los Angeles Concession agreement does overreach considerably more than does the Port of Long Beach Concession agreement. However, each is likely to result in at least some irreparable harm to the motor carriers, and, on balance, the district court abused its discretion when it denied a preliminary injunction as to significant parts of the agreements. While we have pointed to a number of provisions which may be invalid and cause irreparable harm, we, of

jurisdiction to be unenforceable, unlawful, invalid, or subject to an order of temporary or permanent injunction from enforcement, such determination shall only apply to the specific provision and the remainder of this Concession shall continue in full force and effect."

course, leave it to the district court to decide the validity of each of those in the first instance and to decide the separability of each from the remainder of each Concession agreement. However, we do note that the Los Angeles Port's independent contractor phase-out provision is highly likely to be found preempted and enjoined.

We reverse the district court's decision as to the Concession agreements, and remand for further consideration of the specific terms of each agreement and for the issuance of an appropriate preliminary injunction. The district court shall proceed as quickly as possible so that ATA will not suffer unnecessary harm from any unconstitutional provisions.

REVERSED and REMANDED. No petition for rehearing will be entertained and the mandate shall issue forthwith.