CALIFORNIA TOW TRUCK ASSOCIATION, Plaintiff,

v.

CITY & COUNTY OF SAN FRANCISCO, Defendant.

No. C 10–03184 CRB.

United States District Court, N.D. California.

March 2, 2013.

Patrick James Whalen, Brooks Ellison, The Law Offices of Brooks Ellison, Sacramento, CA, for Plaintiff.

Vince Chhabria, San Francisco City Attorney's Office, San Francisco, CA, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART CROSS–MOTIONS FOR SUMMARY JUDGMENT

CHARLES R. BREYER, District Judge.

If tow trucks or tow firms do business in the City and County of San Francisco ("City"), the City requires them to participate in a permit system ("Permit System"). Plaintiff, the California Tow Truck Association ("CTTA"), seeks a declaration

that the Permit System is preempted by the Federal Aviation Administration Authorization Act ("FAAAA"), along with a no-enforcement injunction and attorney's fees. The FAAAA expressly preempts state and municipal laws "related to a price, route, or service of" tow trucks, 49 U.S.C. § 14501(c)(1), but also expressly preserves state authority to regulate (1) motor vehicle safety, (2) minimum insurance requirements, and (3) the price of nonconsensual tows, *id.* §§ 14501(c)(2)(A), (c)(2)(C).

In December 2010, this Court held that the FAAAA preempted enforcement of the Permit System with respect to consensual towing and to tow trucks merely passing through the City on their way to someplace else, but not with respect to nonconsensual tows. *Cal. Tow Truck Ass'n v. City & Cnty. of S.F.,* No. C 10–03184, 2010 WL 5071602 (N.D.Cal. Dec. 7, 2010) ("*CTTA I*"). Both sides appealed. The Ninth Circuit clarified that, while this Court had addressed the Permit System as a whole, case law required the Court to analyze each challenged provision individually. *Cal. Tow Truck Ass'n v. City & Cnty. of S.F.,* 693 F.3d 847 (9th Cir.2012) ("*CTTA II*"). The Ninth Circuit remanded for that purpose.

On remand, the parties filed cross-motions for summary judgment, both of which rely on the existing evidentiary record. CTTA MSJ (dkt. 44), City XMSJ (dkt. 45), CTTA Reply (dkt. 46), City Reply (dkt. 47). For the reasons set forth herein, the Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to all but one of the challenged provisions, which imposes a price cap on the rates towing firms may charge. That provision aside, the challenged provisions of the Permit System either (1) fall within one of the three exceptions to FAAAA preemption or (2) are not subject to FAAAA preemption in the first place. As

for the preempted price-cap provision, it is an ancillary provision that may be severed without disturbing the remainder of the Permit System. Finally, the Court holds that the Permit System applies without distinction between consensual and nonconsensual tows.

## I. BACKGROUND

CTTA initially brought this action for declaratory and injunctive relief in California state court in July 2010, whereupon the City timely removed to this Court. Not. of Removal (dkt. 1). CTTA's Complaint pled a cause of action based on the FAAAA preemption theory now at bar. Compl. (Not. of Removal, Ex. B) ¶¶ 18–22. It also pled two causes of action based on state-law preemption, a Fourth Amendment cause of action for illegal seizure, and a dormant Commerce Clause challenge. *Id.* ¶¶ 23–44. At the summary judgment phase, the City and CTTA filed cross-motions for summary judgment on the federal claims. CTTA also filed a separate motion for summary judgment on the state claims. On December 7, 2010, the Court partially granted both cross-motions as to the FAAAA preemption issue. *CTTA I,* 2010 WL 5071602, at *7. The Court held that the FAAAA preempted the Permit System to the extent that it "applies to tow drivers or tow firms engaged in towing activity other than non-consensual towing." *Id.* at *1. That is, the Court held that the City could not enforce the Permit System with respect to tow trucks and firms that provide only consensual tows or to tow trucks merely passing through San Francisco, but that the City could enforce the Permit System with respect to tow trucks and firms performing non-consensual tows that begin or end within San Francisco. *Id.* at *7. Turning from the FAAAA preemption issue, the Court rejected CTTA's Fourth Amendment and dormant Commerce Clause challenges and granted

the City summary judgment on those claims. *Id.* The Court then declined to exercise supplemental jurisdiction over the CTTA's remaining state-law preemption claims and remanded those claims to state court. *Id.* at *7–8.

Both parties appealed the Court's FAAAA preemption ruling. On August 27, 2012, a Ninth Circuit panel issued *CTTA II.* The Ninth Circuit observed that this Court had analyzed the Permit System as a whole, as opposed to provision-by-provision, and concluded that in doing so the Court had "[run] afoul of *American Trucking Associations v. City of Los Angeles,* 559 F.3d 1046 (9th Cir. 2009) [ ('*ATA I* ') ], which requires examining the specific provisions" of the permit scheme. *CTTA II,* 693 F.3d at 850–51. The Ninth Circuit emphasized that provision-by-provision analysis is required because the FAAAA's preemption exceptions might encompass some but not all of a particular scheme. *Id.* at 860–61. Without provision-specific analysis, "a single valid excepted provision could allow a vast amount of nonexcepted provisions to stand." *Id.* at 863 (quoting *ATA I,* 559 F.3d at 1055 (brackets omitted)).

The Ninth Circuit remanded the case with instructions "to analyze the major provisions identified by the CTTA," addressing, first, "whether a particular provision is even subject to pre-emption in the first place," then, if it is, whether the provision is preempted, and then "whether the Permit System can survive, after severing provisions, if any, that are preempted (or not saved from preemption by a statutory exception)." *Id.* The Ninth Circuit specifically instructed the Court to consider on remand "intervening caselaw such as *ATA III* and its discussion of 'mixed motives.' " *Id.* at 865 (quoting *Am. Trucking Ass'ns v. City of L.A.,* 660 F.3d 384, 405 (9th Cir.2011) ("*ATA III* "), *as amended* (Oct. 31, 2011), *cert. granted in*

*part,* —— U.S. ——, 133 S.Ct. 927, 184 L.Ed.2d 718 (2013)).

The Ninth Circuit raised two other points pertinent to this remand. The first flows from the fact that, in the earlier proceeding, this Court distinguished between consensual, non-consensual, and pass-through tows. The Ninth Circuit regarded this as an "as applied" preemption analysis and instructed this Court to "consider whether it can resolve the preemption questions without analyzing them on an 'as applied' basis." *Id.* As explained in Section III.C below, the Court can and does. The second matter concerns pass-through towing. In light of evidence that the City neither applies nor enforces the Permit System with respect to pass-through tows, the Ninth Circuit concluded that CTTA lacked standing to challenge the Permit System as applied to pass-through towing. *Id.* at 866 (CTTA members' threat of injury "too 'imaginary' or 'speculative' to support jurisdiction" (quoting *Thomas v. Anchorage Equal Rights Comm'n,* 220 F.3d 1134, 1139 (9th Cir. 2000))). Accordingly, on remand, the Court does not address pass-through towing.

## II. *LEGAL STANDARDS*

### A. *Summary Judgment*

Summary judgment is properly entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it

lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The movant is not required to produce evidence negating the non-movant's claims. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("[T]he purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues."). If the movant carries its burden, the burden shifts to the nonmoving party to establish facts beyond the pleadings showing that there remains a triable issue of disputed material fact so that summary judgment is not appropriate. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Adickes*, 398 U.S. at 157, 90 S.Ct. 1598.[1]

### B. *FAAAA Preemption*

■ "Congressional intent ... is the ultimate touchstone of preemption analysis." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1040 (9th Cir.2007). "Preemption analysis begins with the 'presumption that Congress does not intend to supplant state law.'" *Tillison v. Gregoire*, 424 F.3d 1093, 1098 (9th Cir.2005) (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995)). "Although Congress clearly intended FAAAA to preempt some state regulations of motor carriers who transport property, the scope of the pre-emption must be tempered by the 'presumption against the pre-emption of state police power regulations.'" *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700

(1996)). That is, the Court need not interpret "through a deregulatory prism aspects of the State regulatory process that Congress determined should not be preempted." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 440, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002) (emphasis in original) (internal punctuation omitted).

Guided by these presumptions, "analysis of the scope of preemption begins with the text" of the statute. *See Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1060 (9th Cir. 2009). The FAAAA contains an express preemption clause, as well as three express exceptions that are relevant in this case. The general FAAAA preemption clause states, in pertinent part: "Except as provided in paragraphs (2) and (3), a ... political subdivision of a State ... may not enact or enforce a law ... related to a price, route, or service of any motor carrier ...." 49 U.S.C. § 14501(c)(1).[2] This law "does not pre-empt state laws that affect rates, routes, or services in 'too tenuous, remote, or peripheral a manner.'" *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 375, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 390, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)). Rather, it preempts state laws "with a '*significant* impact' on carrier rates, routes, or services." *Id.* (quoting *Morales*, 504 U.S. at 390, 112 S.Ct. 2031).

Sections 14501(c)(2)(A) and (c)(2)(C) contain the three relevant exemptions from FAAAA preemption. Those sections preserve state regulatory authority over (1) motor vehicle safety, (2) minimum insurance requirements, and (3) the price of non-consensual tows. Specifically,

---

1. Here, the parties agree that the factual record requires no further development before summary judgment.

2. The term "motor carrier" encompasses tow trucks. *Ours Garage*, 536 U.S. at 430, 122 S.Ct. 2226.

§ 14501(c)(2)(A) states that the FAAAA's preemption clause "shall not restrict the safety regulatory authority of a State with respect to motor vehicles" or "the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements ...." Section 14501(c)(2)(C) states that FAAAA preemption "does not apply to the authority of a State or a political subdivision of a State to enact or enforce a law, regulation, or other provision relating to the price of for-hire motor vehicle transportation by a tow truck, if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle."

### 1. The Motor Vehicle Safety Exception

The motor vehicle safety exception is the main, though not exclusive, focus of the parties' dispute. As a starting point, courts need not impose the "narrowest possible construction" of the motor vehicle safety exception. *Tillison v. City of San Diego,* 406 F.3d 1126, 1129 (9th Cir.2005) (quoting *Ours Garage,* 536 U.S. at 441, 122 S.Ct. 2226). Rather, the "focus in a [FAAAA] preemption case like this one is whether the purpose and intent of the body passing the law at issue, whether state or municipality, was truly safety." *Id.* That is, legislatures may not use a "purported safety regulation" as a Trojan horse for "undue economic regulation." *See CTTA II,* 693 F.3d at 860; *see also Ours Garage,* 536 U.S. at 440, 122 S.Ct. 2226 (explaining "deregulatory purpose" of FAAAA); *Dilts v. Penske Logistics LLC,* 819 F.Supp.2d 1109, 1116–17 (S.D.Cal. 2011) (in passing FAAAA, Congress sought to (1) "eliminate non-uniform state regulation of motor carriers" and (2) level the playing field between air and motor carriers). Nevertheless, "safety-related towing laws passed by municipalities may fall within the safety exception to the FAAAA, so long as they are *'genuinely responsive to safety concerns.'"* *Tillison,* 406 F.3d at 1129 (quoting *Ours Garage,* 536 U.S. at 442, 122 S.Ct. 2226) (emphasis added).

### 2. Two–Part Test

 "[C]ourts apply a two-part inquiry to determine whether a law is 'genuinely responsive to safety concerns.'" *CTTA II,* 693 F.3d at 860. In the first step, "courts consider available legislative or regulatory intent—ask whether safety relating to motor vehicles was truly a concern. Second, courts assess the nexus between the provision at issue and the safety concern—ask whether the regulation sufficiently 'responds to' the concern." *Id.*

"The first step examines any 'expressions of legislative intent,' including (1) the particular language of the statute or regulation being challenged, and any explicit statutory or regulatory findings in the provision; and (2) available legislative or regulatory history (*e.g.,* committee reports, or statements of lawmakers)." *Id.* (citations omitted). However, the cases do not require the "expressions of legislative intent" to come from formal findings, reports, or statements beyond the enactment itself. *See id.* at 864. "[M]erely because a safety rationale is not documented does not necessarily mean the safety exception cannot apply. Sometimes a safety justification is so obvious that it need not be stated—intent can be obvious from the subject of the regulation itself, as well as from the surrounding circumstances." *Id.* To ascertain the legislative body's intent, courts may consider contemporaneous records and even non-contemporaneous "testimony from members of the legislative body in question." *Id.* at 864 n. 15. "A court should be wary, however, about crediting post hoc safety rationalizations that conflict with the contemporaneous legislative record." *Id.*

"Once a safety motivation is identified, the second step looks to the existing record evidence to determine whether there is a logical or genuine connection between the regulation and the safety justification, or, instead, whether the purported safety justification is a pretext for undue economic regulation." *Id.* at 860 (internal quotation marks omitted). "The more attenuated or speculative the connection, the more likely it will be that a court will find the purported safety motives 'illusory or pretextual' and that the safety justification will not withstand scrutiny." *Id.* (citing *VRC LLC v. City of Dallas,* 460 F.3d 607, 615 (5th Cir.2006)). While the safety justification must be genuine, it need not be the only justification for a particular provision; mixed motives are permissible so long as the challenged provision is "genuinely responsive" to safety concerns. *See ATA III,* 660 F.3d at 405 (where provision was partly motivated by environmental concerns, "[t]he presence of such mixed motives ... does not preclude the application of the safety exception, provided that the State's safety motives are not pretextual"); *see also VRC LLC,* 460 F.3d at 615 ("safety and consumer protection are not mutually exclusive categories").

### 3. Methodology

In an FAAAA preemption case, "a court must analyze a challenge to a comprehensive law on a provision-by-provision basis." *CTTA II,* 693 F.3d at 860. "That is, where a multifaceted law or regulation is challenged as a whole, it is still necessary to analyze each of its essential or major component parts." *Id.* Otherwise, a single excepted provision might save a law that is otherwise preempted, or vice-versa. *See id.*

## III. DISCUSSION

### A. CTTA's Challenges

The central dispute in this case is how much, if any, of the Permit System is saved by the FAAAA's motor vehicle safety exception. In attacking individual provisions of the Permit System, CTTA advances four arguments repeatedly. To streamline the provision-specific analysis ordered by the Ninth Circuit, the Court first undertakes an analysis of CTTA's linchpin arguments. As set forth below, each one misses the mark.

#### 1. Wrong Kind of Safety

CTTA argues that, when San Francisco's Board of Supervisors ("Board") enacted the Permit System, it was concerned with the wrong kind of safety. That is, although CTTA acknowledges that the Permit System evinces a concern with safety, CTTA avers that the Permit System addresses "a *different type of safety* than that which is permissible under the FAAAA." CTTA Reply at 7 (emphasis in original). CTTA's position is that "the safety exception is limited to ordinances that actually address the *safe performance of towing services,* and does not include general anti-crime measures." CTTA MSJ at 13 (emphasis added). Indeed, CTTA goes so far as to say that the plight of a person stranded at night by an illegal tow, though it may present some kind of concern for safety, "cannot fairly be described as having to do with 'motor vehicle safety" because, "by definition, if they are stranded, they have no vehicle." CTTA Reply at 7 (emphasis added). CTTA reiterated this view at oral argument.

CTTA's definition of motor vehicle safety is unduly narrow and at odds with Ninth Circuit precedent. Though the cases do not set forth a "bright line test for what is related to vehicle safety," they do offer "guidance in that regard." *ATA I,* 559 F.3d at 1054. In *Tillison,* the Ninth Circuit held that an ordinance fell within the scope of the motor vehicle safety exception because it

protect[ed] both the vehicle owner and the public from towing mistakes, which may lead to dangerous confrontations, to the owner and his or her family being stranded at a dangerous time and location, to false vehicle theft reports, which waste law enforcement's limited resources, to unnecessary hazardous tows and to similarly unsafe circumstances. The ordinance also protects against theft of vehicles from private property.

406 F.3d at 1130–31 (quoting *Galactic Towing, Inc. v. City of Miami Beach,* 274 F.Supp.2d 1315, 1319 n. 1 (S.D.Fla.2002) *aff'd,* 341 F.3d 1249 (11th Cir.2003)). *Tillison* also cites approvingly a California Court of Appeal's remark that "legislation which tends to assist members of the public from involuntarily losing the use of their vehicles and which tends to expedite recovery of their vehicles" evinces a permissible concern with motor vehicle safety. *See id.* at 1130 (quoting *Berry v. Hannigan,* 7 Cal.App.4th 587, 591, 9 Cal.Rptr.2d 213 (Ct.App.1992) (brackets omitted)).

Thus, in the FAAAA preemption context, the Ninth Circuit has endorsed a concept of motor vehicle safety that encompasses but surely goes well beyond the safe performance of towing services. *Tillison*'s notion of motor vehicle safety includes the dangers flowing from a heightened risk of "dangerous confrontations," as well as a concern for stranded motorists' personal safety. It identifies a legitimate safety concern that arises when "law enforcement's limited resources" are wasted responding to false alarms prompted by improper tows. It recognizes, too, that property crime, when directed toward towed vehicles, is a motor vehicle safety concern, as is unwarranted interference with an owner's right to reclaim her vehicle.

This concept of motor vehicle safety finds support in the FAAAA's text. The motor vehicle safety exception preserves "the safety regulatory authority of a State with respect to motor vehicles." 49 U.S.C. § 14501(c)(2)(A). The City argues that the phrase "with respect to" is best read to signal Congress's intent to avoid a narrower construction. City Reply at 4 (citing *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). The Court agrees. The statutory language offers no reason to think that Congress meant to curtail the usual scope of states' "safety regulatory authority" in connection with motor vehicles. *See Ours Garage,* 536 U.S. at 442, 122 S.Ct. 2226. Though that authority, being limited to the motor vehicle context, is something less than the full scope of their police power, it surely includes the power to require tow truck drivers and firms to obtain permits.[3]

In arguing for a narrower reading of the motor vehicle safety exception, CTTA leans heavily on two out-of-circuit cases,

---

**3.** The cases that have directly addressed the scope of the states' retained police power in the towing context recognize a limitation on that power. "[A]n exclusion from preemption for all police-power enactments would surely swallow the rule of preemption, as most state laws are enacted pursuant to this authority." *VRC LLC,* 460 F.3d at 615 n. 7 (internal quotation marks omitted). "[E]ven if some kind of general public health concerns are (or may be) involved in a statute or regulation—for example control of cigarette usage—that alone does not bring the regulation within the ambit of the motor vehicle safety exception." *ATA I,* 559 F.3d at 1054. "Indeed, if too broad a scope were given to the concept of motor vehicle safety, the exception would swallow the preemption section itself or, at the very least, cut a very wide swath through it." *Id.* Thus, to escape preemption, a state law must be related not just to public safety in general, but to *motor vehicle* safety. *Id.; see also Dilts,* 819 F.Supp.2d at 1123 (FAAAA preempted trucking company employees' state-law meal and rest break claims because they were "not directly connected to motor vehicle safety").

*Dykstra* and *Northway*.[4] CTTA MSJ at 11–15. In *Dykstra*, the Second Circuit held that the FAAAA preempted enforcement of New York City's tow-truck licensing scheme "against out-of-City tow truck operators." 520 F.3d at 212. While the Second Circuit accepted that the legislative record was "replete with evidence that the City sought to curb a public safety risk by carefully regulating tow trucks engaged in chasing"—the dangerous practice of tow-truck drivers "monitoring police radios and 'chasing' each other to reach the scene of a car accident first"—the *Dykstra* court nevertheless rejected New York City's argument that the regulations had helped improve public safety. *Id.* at 216. It did so because the city had "not presented any evidence" supporting that argument and had "never assessed the effectiveness" of the regulations. *Id.* Similarly, in *Northway*, the Southern District of Texas struck down a permit requirement for tow trucks enacted by the city of Pasadena, Texas. 94 F.Supp.2d at 803–04. Pasadena had argued that the permit ordinance fell within the motor vehicle safety exception because, by identifying tow-truck drivers and operators for police, it deterred car theft by persons merely posing as tow-truck drivers. *Id.* at 803. The *Northway* court rejected this argument because the city had "not explain[ed] why its police [could not] adequately identify suspicious tow truck drivers and operators by checking their state-issued driver's licenses and commercial vehicle registrations." *Id.* Further, the court reasoned, "even if the permit ordinance does enable Pasadena police to investigate automobile theft more easily, it does not ensure that the towing and storage of motor vehicles will be performed safely." *Id.* From *Northway* and *Dykstra*, CTTA derives the principle that the FAAAA's "safety exception is limited to ordinances that actually address the safe performance of towing services, and does not include general anti-crime measures." CTTA MSJ at 13.

■ CTTA is only partly correct. It is true that the FAAAA does not exempt from preemption *general* anti-crime measures. However, the FAAAA does exempt those anti-crime measures which fall within a municipality's regulatory authority with respect to motor vehicle safety. Critically, that regulatory authority extends to more than just safe tow-truck driving or the tow truck driver's safe use of his equipment. Rather, "a logical or genuine connection between the regulation and the [motor vehicle] safety justification" will suffice to bring a towing regulation within the ambit of the motor vehicle safety exception. *CTTA II*, 693 F.3d at 860 (internal quotation marks omitted). The Court declines to adopt the narrow construction of motor vehicle safety advanced by CTTA.[5]

## 2. *Wrong Kind of Motive*

Closely related to CTTA's argument that the Permit System evinces a concern with the wrong kind of safety is its argu-

---

4. *Auto. Club of New York, Inc. v. Dykstra*, 520 F.3d 210 (2d Cir.2008) (per curiam); *Northway Towing, Inc. v. City of Pasadena, Tex.*, 94 F.Supp.2d 801 (S.D.Tex.2000). *Northway* was abrogated by *Stucky v. City of San Antonio*, 260 F.3d 424 (5th Cir.2001), which in turn was abrogated by *Ours Garage*.

5. As the City points out, City Reply at 7–8, any concern about municipal over-regulation is less than pressing, for Congress has provided a mechanism to deal with over-regulation. The Secretary of Transportation is authorized by statute "to void any 'State law or regulation on commercial motor vehicle safety' that, in the Secretary's judgment, 'has no safety benefit ... [or] would cause an unreasonable burden on interstate commerce.' " *Ours Garage*, 536 U.S. at 441, 122 S.Ct. 2226 (quoting 49 U.S.C. § 31141(a), (c)(4)) (ellipsis and brackets in original).

ment that the Permit System targets impermissible, nonsafety objectives. CTTA singles out several of the Permit System's provisions as addressing consumer protection rather than, or in addition to, safety. CTTA MSJ at 14, 21; CTTA Reply at 2, 4, 13–14, 16.

■ The mere existence of a consumer protection (or other non-safety motive) is not, however, problematic in and of itself. Nothing forbids legislatures that enact towing regulations from harboring mixed motives, so long as their motor vehicle safety motivation is not pretextual and the regulations they enact have a sufficiently logical connection to motor vehicle safety. *See CTTA II*, 693 F.3d at 860 ("[T]he presence of such mixed motives does not preclude the application of the safety exception, provided that the [lawmaking body's] safety motives are not pre-textual.") (internal quotation marks, brackets, and ellipsis omitted); *see also ATA III*, 660 F.3d at 405 (FAAAA did not preempt law motivated by both safety and environmental concerns). Though CTTA criticizes several provisions of the Permit System as impermissible consumer protection laws, "safety and consumer protection are not mutually exclusive categories." *CTTA II*, 693 F.3d at 860 (quoting *VRC LLC*, 460 F.3d at 615). The gravamen of the Court's inquiry is whether the purported motor vehicle safety justification is pretextual. *Id.* Accordingly, so long as motor vehicle safety is truly the legislature's concern, even if only one concern among others,

then the mere fact that the challenged regulation implicates non-safety legislative objectives does not result in FAAAA preemption. "Allowing for 'mixed motives' makes sense, for in reality lawmakers may have multiple reasons for enacting laws." *Id.* The relevant question is whether the Board was *genuinely* (as opposed to *exclusively*) concerned with motor vehicle safety.[6]

### 3. Unresponsive to "Articulated" Safety Concerns

CTTA suggests several times in its briefing that, in order to survive an FAAAA preemption challenge, a towing regulation must be responsive not only to a genuine and exclusive motor vehicle safety concern, but to a genuine, exclusive, *and articulated* motor vehicle safety concern. *See, e.g.*, CTTA MSJ at 15 (faulting Permit System for "do[ing] nothing to address the [Board's] articulated safety concerns"); CTTA Reply at 8 (regulations "have nothing whatsoever to do with the narrow public safety concerns articulated in the findings"), 11 ("The City's burden in this case is to show that the scheme they have enacted is 'genuinely responsive' to the [Board's] articulated safety concerns."). However, the cases impose no requirement for legislatures to "articulate" separate legislative findings supporting their motor vehicle safety enactments. "Sometimes a safety justification is so obvious that it need not be stated—intent can be obvious from the subject of the regulation itself, as

---

**6.** CTTA's position finds the most support in *Dykstra*. That case, however, appears to be out of step with the law of the Ninth Circuit. In *Dykstra*, the Second Circuit appeared to reject one of New York City's towing regulations in part because it sounded in consumer protection and was "not genuinely responsive to safety concerns." 520 F.3d at 216 n. 5. To the extent *Dykstra* suggests that a towing regulation is not genuinely responsive to safety concerns *because* it serves a consumer-protec-

tion purpose, *Dykstra* controverts Ninth Circuit guidance on mixed motives and this Court declines to follow it. *See CTTA II*, 693 F.3d at 860; *ATA III*, 660 F.3d at 405; *see also Tillison*, 406 F.3d at 1128–29 (abrogating an earlier Ninth Circuit case, *Tocher v. City of Santa Ana*, 219 F.3d 1040 (9th Cir.2000), which had struck down a towing regulation because it "was intended to further consumer protection *rather than* safety" (emphasis added)).

well as from the surrounding circumstances. [Citation.] It would elevate form over substance to invalidate permit requirements merely because local lawmakers did not articulate the obvious." *CTTA II*, 693 F.3d at 864–65; *see also Gregoire*, 424 F.3d at 1102–03 (upholding towing regulation even though "legislature did not expressly state a public safety purpose" for it).

The clearest indication of legislative intent in this case consists of the words of the provisions of the Permit System themselves and the subjects they address. *See CTTA II*, 693 F.3d at 860. Neither party has cited legislative history dating from the initial enactment of either Article 30 (the tow driver regulations) or Article 30.1 (the tow firm regulations). Presumably, that history is nonexistent or lost: Articles 30 and 30.1 were enacted in 1973 and 1997, respectively. *See* S.F. Ord. 16–73 (Art. 30); S.F. Ord. 21–97 (Art. 30.1). In the absence of contemporaneous legislative history, CTTA extensively cites legislative findings that the Board made in 2009 when adding to the long-extant Permit System a requirement that tow firms provide the owners of towed vehicles with a brochure summarizing California towing law. S.F. Ord. 11–09 (the "2009 Findings"), *codified as* S.F. Police Code § 3055.2(a), *available at* http://www.sfbos.org/ftp/uploadedfiles/bdsupvrs/ordinances09/o0011–09.pdf. It is true that the Court must consider the 2009 Findings—but not to the exclusion of the primary evidence of the Board's intent, namely the language of the ordinances they passed and the subject matters regulated thereby. *See CTTA II*, 693 F.3d at 864–65; *Gregoire*, 424 F.3d at 1102–03.[7]

The City, for its part, relies heavily on the Declaration of Sergeant William Coggan, the San Francisco Police Department ("SFPD") officer who oversees the City's Permit System. Coggan Decl. (dkt. 12) ¶ 2. Sgt. Coggan's declaration was executed in October 2010. *Id.* at 5. Accordingly, it not direct evidence of the Board's intent when passing particular provisions of the Permit System, all of which predate the Declaration. Sgt. Coggan's Declaration is best regarded as evidence of the context or "surrounding circumstances" in which the ordinances were passed, *CTTA II*, 693 F.3d at 864, and the Court treats it as such.

#### 4. *No Evidence of Effectiveness*

CTTA argues with some force that, not only must particular provisions of the Permit System "genuinely" address motor vehicle safety, they must "actually" or "effectively" address it or else be preempted. CTTA MSJ at 12–15. In this vein, CTTA faults the City for relying on Sgt. Coggan's Declaration since it "is entirely bereft of any *statistical data* showing that the incidence of illegal towing from private property declined after the scheme was implemented." CTTA Reply at 10 (emphasis added); *see also id.* at 11 (Coggan's Declaration contains "*no metrics, no statistics, no data* whatsoever showing that that [sic] safety has increased, or that the number of police calls are down, or that illegal towing has been reduced." (emphasis added)). In challenging specific provisions, CTTA frequently reprises its demand for metrics, statistics, or data showing that a provision has "actually" addressed—that is, has been effective at addressing—the Board's articulated concerns. *See id.* at 14 ("[n]ot a

---

**7.** As the *CTTA II* panel pointed out, how much light the 2009 findings shed on the Board's intent vis-à-vis earlier enactments is an "open question." 693 F.3d at 861. The parties have not attempted to provide a defini-

tive answer on remand and the Court need not either. The challenged provisions themselves provide ample evidence of legislative intent, all of which is consistent with the concerns articulated in the 2009 Findings.

single iota of evidence" shows that required brochures improve safety), 15 (same, with respect to requirement that tow drivers carry and display permits), 16 (same, with respect to requirement that towers have a police-approved complaint system).

As the City quite rightly points out, however, City Reply at 1, CTTA's demand for statistical data assumes that the FAAAA imposes on the City a duty to generate and marshal such data. CTTA appears to derive its assumption from *Dykstra*. In that case, the Second Circuit faulted New York City for failing to present evidence that the towing regulations it had enacted to reduce "chasing" had actually worked. 520 F.3d at 216. The *Dykstra* court disapproved of New York City's never having "*assessed the effectiveness* of the [anti-chasing] Scheme in fighting chasing*." *Id.* (emphasis added).

To the extent *Dykstra* would impose on municipalities a requirement to generate and marshal statistical evidence demonstrating the effectiveness of any and all towing ordinances in order to survive a FAAAA preemption challenge, it does not reflect the law of the Ninth Circuit. The Ninth Circuit cases focus on legislative *intent,* not legislative *effectiveness.* *See, e.g., Tillison,* 406 F.3d at 1129 (disapproving district court analysis that "focus[ed] on the actual effect of the statute" and noting that "[t]he focus of the safety exception to preemption must be on the legislative intent and whether the legislature was acting out of safety concerns"). In an FAAAA preemption case, the Court's task is to ferret out state and municipal economic regulations which merely pose as safety regulations—not, as CTTA and *Dykstra* seemingly assume, to strike down such regulations unless it can be proved that they work.

At oral argument, CTTA suggested that *ATA III* requires a showing of legislative effectiveness because the panel in that case upheld a challenged provision on the ground that it "was intended to be *and is* genuinely responsive to safety." *ATA III,* 660 F.3d at 404 (emphasis added). CTTA's suggestion is misplaced. The *ATA III* court upheld the challenged provision not because of any statistical showing—there was none—but because it perceived "a logical connection" between the provision and motor vehicle safety. *Id.* at 405. The *ATA III* went on to discuss a contrasting situation in *Loyal Tire,* where the Second Circuit struck down a local towing ordinance in light of record evidence that: the municipality had passed the ordinance to discriminate against an out-of-town tower; parts of the regulation bore no rational relationship to safety; and the city only began to identify safety justifications after litigation had commenced. *Id.* (citing *Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury,* 445 F.3d 136, 146–48 (2d Cir.2006)). *ATA III* stands for the proposition that municipal and state towing ordinances should be upheld absent a showing that their declared safety motives are illusory or pretexts for economic regulation that would thwart the FAAAA's deregulatory purpose. It does not require states and municipalities to make a detailed statistical showing proving the effectiveness of their regulations. In the absence of any authority that would impose such a heavy evidentiary burden, the Court declines to place it on the City here.[8]

---

**8.** This is not to say that a city or state could *never* be required to make a detailed evidentiary showing along the lines demanded by CTTA here. The Court holds only that such a showing is not required in this case because the connection between the purported motor vehicle safety rationales and the actual provisions is direct and obvious, rather than remote or obscure.

## B. Analysis of Specific Provisions of the Permit System

The Permit System is set forth in Articles 30 and 30.1 of the San Francisco Police Code. Article 30 regulates "tow car drivers" while Article 30.1 regulates "tow car firms." S.F., Cal., Police Code art. 30., §§ 3000–13; *id.* art. 30.1, §§ 3050–65.[9] The two Articles regulate drivers and firms in substantially similar ways. Accordingly, while attending to the Ninth Circuit's instruction to address "each of [the Permit System's] essential or major component parts," *CTTA II,* 693 F.3d at 860, the Court addresses specific provisions of the Permit System in groups wherever doing so is logical and convenient.

### 1. *Permit Requirements: Sections 3000 & 3050*

Sections 3000 and 3050 require tow drivers and tow firms, respectively, to hold a City-issued permit in order to operate within San Francisco. S.F. Police Code §§ 3000, 3050. As an initial matter, both permit requirements fall squarely within the FAAAA's general preemption provision. They are laws enacted by a "political subdivision of a State" which are "related to" the "service of any motor carrier." 49 U.S.C. § 14501(c)(1). They clearly have "more than an indirect, remote, or tenuous effect on" the services of tow-truck drivers and firms operating within San Francisco, since tow truck operators cannot lawfully render services at all without a City-issued permit. *Gregoire,* 424 F.3d at 1099; *cf. Galactic Towing,* 274 F.Supp.2d at 1322–23 (holding that motor vehicle safety exception saved Miami Beach's tow-truck permit requirement). Accordingly, the City's tow-driver and tow-firm permit requirements are preempted unless they relate to one of the three areas where the City's regulatory authority has been excluded from FAAAA preemption: motor vehicle safety, minimum insurance requirements, or the price of non-consensual tows.

 The City argues that the permit requirements fall within all three exceptions. City XMSJ at 11–12. The Court agrees. While mindful that "the slate is clean" on remand, *CTTA II,* 693 F.3d at 865, the Court sees no reason to depart from its earlier determination that section 3000 and 3050's permit requirements "fall[ ] within all three preemption exceptions." *CTTA I,* 2010 WL 5071602, at *3. As the Court explained at that time, in reasoning that specifically addressed the Permit System's essential requirement that tow drivers and firms possess permits:

> Keeping tabs on drivers and firms engaged in non-consensual towing via a permit system makes it easier for the City to ensure that insurance requirements are being met and reasonable fees are being charged. Further, and more importantly given the extent of regulation, the provisions relating directly or indirectly to fees and insurance dovetail with the broader safety-related purposes of the Permit System—keeping tabs on drivers and firms engaged in the inherently dangerous business of non-consensual towing and weeding out at the front end those most likely to misbehave.

*Id.* Additionally, as the City points out, the presence of a permit requirement implies the threat of permit revocation. City XMSJ at 12 (citing Coggan Decl. ¶¶ 21–23). This makes the essential permit requirement a tool for policing misconduct in the towing industry. Such misconduct clearly bears on motor vehicle safety, whether directly, as in the case of illegal towing or intentional interference with the

---

**9.** "Tow car" and "tow truck" are synonyms. *CTTA II,* 693 F.3d at 851 n. 1.

retrieval of towed vehicles, or indirectly, as when police resources are diverted to an investigation into the propriety of a tow. *See Tillison,* 406 F.3d at 1130–31. Moreover, the essential requirement of a permit enables the City to "weed out" and "keep tabs on" tow drivers and firms who, otherwise, would be free to flout safety, insurance, or price requirements until and unless they were caught in some other improper act.

CTTA, focusing exclusively on the motor vehicle safety exception and ignoring the other two, strenuously disagrees. *See* CTTA MSJ at 15, 18. Relying on *Dykstra* and *Northway,* CTTA argues that the permit requirement must be struck down because it is "facially" unconcerned with safety and "does nothing" to actually increase safety. CTTA MSJ at 15. CTTA opines that "[s]afety might be achieved by requiring tow truck drivers to pass a driving test, or to demonstrate competence in towing motor vehicles, but merely requiring them to obtain a permit does nothing for safety." *Id.*

CTTA's challenge to the permit requirements assumes that the permit requirements must have some "facial" concern with safety. But that is not so. In *Gregoire,* for instance, the Ninth Circuit turned aside an FAAAA preemption challenge to a Washington state statute, notwithstanding the fact that the statute did "not expressly declare a public safety purpose." 424 F.3d at 1101. Similarly misplaced is CTTA's suggestion that the permitting requirement must "do something" to increase safety—that is, must actually or effectively increase safety. The cases impose no such requirement of legislative effectiveness, only a requirement that the legislation be "genuinely" responsive to motor vehicle safety, as opposed to a mere pretext for economic regulation that would undermine the deregulatory purposes of the FAAAA. Lastly, Ninth Circuit cases evince a notion of motor vehicle safety that

extends well beyond "requiring tow truck drivers to pass a driving test" or "demonstrat[ing] competence in towing motor vehicles." *See* CTTA MSJ at 15.

The essential requirement that tow drivers and tow firms obtain City-issued permits before transacting business within San Francisco enables other provisions of the Permit System to work. As set forth below, several of those other provisions regulate motor vehicle safety more directly. The essential permit requirement regulates indirectly, through the other requirements it enables. But to say that the permit requirement regulates indirectly is not to suggest that it is less than "genuinely responsive" to motor vehicle safety (or, as the case may be, somehow not "related to" insurance or the price of non-consensual tows). On the contrary, the connection between the requirement that tow trucks and firms obtain a permit has an obvious, logical, and genuine connection to motor vehicle safety. Most importantly, nothing in the record suggests that the City's permit requirement is a pretext for economic regulation: While the City charges a fee for permit application and renewal, it is undisputed that the City may only use those fees to defray the cost of the Permit System. If that is a scheme to fill the City's coffers, it is an odd one.

The Court GRANTS the City's Motion and DENIES CTTA's Motion as to the essential permitting requirement embodied in sections 3000 and 3050.

### 2. *Permit Application Requirements: Sections 3002 & 3052*

Section 3002 sets forth the requisite contents of a tow-driver permit application; section 3052 does the same for tow-firm applicants. *See* S.F. Police Code §§ 3002, 3052. Section 3002 requires tow-driver permit applicants to provide their name, address, height, weight, eye and hair color, date of birth, the name and address of their employers, their California driver li-

cense number (as well as any restrictions thereon), a list and description of all criminal arrests, and other information as requested by the Chief of Police. Similarly, section 3052 requires applicants for a tow-firm permit to provide, *inter alia,* identifying information for the firm owner, identifying information for each tow truck operated by the firm, a description of the firm's business plan, "a system for handling complaints that is acceptable to the Chief of Police," the name and permit number of the firm's drivers, evidence of minimum insurance coverage, and a record of all the applicant's criminal convictions.

As a preliminary matter, the Court notes that both parties have assumed without discussion that these code sections fall within the scope of FAAAA preemption by significantly impacting "carrier rates, routes, or services," *Rowe,* 552 U.S. at 375, 128 S.Ct. 989, and proceed directly to arguing whether the motor vehicle safety exception applies.[10] The parties' assumption, while not unassailable, is ultimately correct.[11] Accordingly, the Court turns to

---

**10.** The closest either party comes to addressing the threshold question of whether sections 3002 and 3052 are preempted "in the first place," *CTTA II,* 693 F.3d at 863, is when CTTA identifies various ways the Permit System "impacts" its members, apparently in an effort to demonstrate how the Permit System as a whole falls within the FAAAA's preemptive scope, *see* CTTA MSJ at 8–9. These impacts include the potential impound of non-permitted tow trucks, the cost of obtaining a permit and attendant impact on prices charged to customers, the impact on "routes and services" that occurs when "drivers who do not have a permit are forced to take alternate routes around the City," the impact of regulatory costs on "the ability of [towing] companies to grow and expand their business[es]," and increased response times for drivers who "have refused to obtain the required permits." *Id.* at 9. Even assuming *arguendo* that all of these impacts may be laid at the City's feet, they speak only to the effect on prices, routes, and services *of having no permit.* That is to say, they do not speak to the effect on rates, prices, and services that flows from, for example, the requirement that applicants provide identifying information in their applications, *see* S.F. Police Code §§ 3002(1)(4), 3052(1)-(4), or the requirement that applicants divulge a record of their criminal arrests, *id.* §§ 3002(5), 3052(7). CTTA has not made a threshold showing that *each* challenged provision of the Permit System falls within the FAAAA's preemptive scope.

**11.** *ATA III* illustrates why. In that case, the Port of Los Angeles required drayage carriers (that is, truckers) who sought to work out of the Port to sign a concession agreement. As part of the concession agreement, the carriers

had to demonstrate their "financial capability to perform [their] obligations." *ATA III,* 660 F.3d at 403. The Ninth Circuit held that this "financial capability" requirement did not fall within the scope of FAAAA preemption because it neither "directly impact[ed] the drayage services provided to customers," nor "directly regulate[d] the routes served or the prices charged," nor "indirectly" bound the truckers to providing "particular rates, routes, or services" regardless of what market conditions would dictate. *See id.* at 403–04. The *ATA III* court based its holding, however, at least in part on evidence that "[t]he Port [had] never refused to sign a concession agreement on the basis of the financial capability provision" and testimony from the regulated motor carriers "that the financial capability provision would not change their operations." *Id.* at 404. The applicable principle, then, appears to be: If information collected in the course of a permit application has led or could lead to denial of the application or to a change in the manner of operation of a regulated carrier, then the requirement to provide that information falls within the preemptive scope of the FAAAA, since denial of the application would prevent the applicant from rendering "service" in the first instance and a change in the manner of operation would alter "services" in a manner not dictated by market conditions. Here, sections 3004 and 3054 govern the City's review process for, respectively, tow-driver and tow-firm permit applications. Section 3004 provides that when the Chief of Police receives a tow driver application, he "shall" investigate the application, give the applicant a hearing, and then "grant such application unless he finds," *inter alia,* that the applicant "[h]as intentionally falsified *any* statement contained

the question of whether the motor vehicle safety exemption saves the permit application requirements.

■ CTTA first attacks the provisions of the Permit System that require applicants to provide identifying information for tow drivers and their trucks, arguing that "the fact that police can more easily identify drivers does nothing to improve towing safety." CTTA MSJ at 16. What CTTA means by "towing safety," however, is the safe driving of tow trucks. *See id.* That is not the only type of safety that the City may regulate without fear of preemption. *See supra* Section III.A.1 (Ninth Circuit countenances broader notion of motor vehicle safety). The Board's intent in enacting the identification requirements is obvious: The requirements are designed to enable the City to more rapidly identify and locate the drivers and firms responsible for improper tows and, thereby, to increase deterrence and aid enforcement of motor vehicle safety laws.

Proceeding to the second step of the analysis, there can be no question that the "existing record evidence," *CTTA II*, 693 F.3d at 860, shows a logical connection between the information-collection requirements and the Board's motor vehicle safety justification. Sgt. Coggan's Declaration states that SFPD "uses the personal information provided by tow companies and drivers during the application process . . . to investigate complaints, and to track down company officials or employees who are alleged to have stolen a vehicle, overcharged for a tow, or otherwise operated in a manner that threatens the safety of the public." Coggan Decl. ¶ 10. CTTA

offers no evidence to undercut that statement or, more to the point, to suggest that the identification requirements are a "pretext for undue economic regulation." *CTTA II*, 693 F.3d at 860. Indeed, what such a pretext might be is difficult to imagine. The identification requirements are genuinely responsive to the motor vehicle safety concerns evident from the face of sections 3002 and 3052. Accordingly, the Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to the identification requirements embedded in those sections.

Sections 3002 and 3052, however, contain more than just identification requirements. CTTA's challenges to the other requirements are addressed separately below.

3. *Criminal Activity Reporting Requirements: Sections 3002(5), 3004(a-b), 3011, 3052(7), 3054(3) & 3056(1)*

The Permit System requires applicants for a tow-driver permit to divulge their criminal arrest records. S.F. Police Code § 3002(5). With respect to convictions, it requires the Chief of Police to deny the application of anyone who "has been convicted of burglary, robbery, theft, receipt of stolen property, breaking or removing parts from a vehicle, malicious mischief to a vehicle[,] unlawful use or tampering by bailee of a vehicle, or altering a vehicle identification number" up to four years before applying. *Id.* § 3004(a). It also requires the Chief to deny the application of anyone found to have "acted in violation of" those criminal statutes, regardless of whether a conviction ensued. *See id.* § 3004(b). The Chief also must revoke a

---

in his application." S.F. Police Code § 3004(c) (emphasis added). Section 3054 similarly requires the Chief of Police to grant completed tow firm applications unless, *inter alia*, "[t]he applicant has knowingly falsified *any* statement contained in his application . . . ." *Id.* § 3054(4) (emphasis added). In

sum, the Chief of Police must deny an application that contains "any" knowingly falsified information. The application requirements here, then, are not the same type of window-dressing requirements considered in *ATA III*, for they can result in the denial of at least some applications.

tow driver's permit "if after a hearing on the matter he finds that grounds exist which would have constituted just cause for refusal to issue such a permit." *Id.* § 3011.

As for tow-firm permit applicants, section 3052(7) requires them to divulge "all crimes of which the applicant has been convicted, plead guilty, or plead no contest." The Chief shall deny a tow-firm permit to any applicant who

> has been convicted of theft, petty theft, theft of a vehicle, breaking or removing vehicle parts, malicious mischief to vehicle, check fraud, credit card fraud, driving under the influence of alcohol or drugs, vehicular manslaughter, reckless driving bodily injury, any sex offense which would cause the applicant to be registered as a sex offender, any unlawful carrying, use or possession of a firearm, any assault or battery (misdemeanor or felony), kidnapping, arson, extortion, murder, possession of alcoholic beverage, opened alcohol container, marijuana, or narcotic drug while driving, [or] bailee tampering[.]

*Id.* § 3054(3). This code section does not specify a limitations period, but section 3056(1) apparently provides one: That section authorizes the Chief to "suspend or revoke" any tow firm's permit if "[w]ithin five years prior to the date of application the applicant has been convicted of" one of the crimes listed in § 3054(3).

■ CTTA raises a number of objections to these reporting requirements, but the Court need not delve into an extended discussion of them. Assuming without deciding that each of the challenged sections is subject to preemption, the Court determines that the motor vehicle safety justification of ordinances that require tow drivers and tow firm operators to report and refrain from criminal activity "is manifest." *Cole v. City of Dallas,* 314 F.3d 730, 735 (5th Cir.2002). In *Cole,* the Fifth Circuit

turned aside an FAAAA preemption challenge to a Dallas city ordinance that "prohibit[ed] persons from receiving a wrecker driver's permit to tow motor vehicles if they ha[d] a criminal history including certain specified criminal convictions, documented mental illnesses or unsafe driving records." *Id.* at 732. The Cole court commented that it was "difficult to imagine a regulation with a more direct protective nexus or peripheral economic burden." *Id.* at 735. The same holds true here. Few regulations could bear more directly on motor vehicle safety than those that seek to prevent auto thieves, drunk drivers, check forgers, or extortion artists, to name a few, from participating in an industry which entrusts them with automobiles, with drivers' sensitive financial information, and, often, with the bodily safety of those they serve.

The Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to the criminal activity reporting requirements set forth in sections 3002(5), 3004(a-b), 3011, 3052(7), 3054(3), and 3056(1).

### 4. Permit Fee Requirements: Sections 3003 & 3053

CTTA challenges sections 3003 and 3053, which, in substantially similar language, require permit applicants to pay both a filing fee and a "[f]ingerprinting fee . . . to cover the cost of fingerprinting, classifying and searching of" fingerprint records. As an initial matter, these requirements have something more than a tenuous or remote connection to the services of tow truck drivers and firms in San Francisco, since failure to pay the required fee presumably results in rejection of the application. *See ATA III,* 660 F.3d at 403 (application requirements that cannot or do not result in application denial fall outside FAAAA's preemptive scope because they do not impact motor carrier services). Accordingly, the permit fee requirements

must fall within one of the exceptions to FAAAA preemption to survive CTTA's challenge.

 The Court concludes that the permit fee requirements fall within all three exceptions. They are simply a mechanism for funding the Permit System, so the rationales applicable to the essential permit requirements, sections 3000 and 3050, apply to sections 3003 and 3053 as well. The permit fee requirements enable the operation of the more direct regulatory mechanisms embedded within the Permit System, and thus regulate in the same areas as the Permit System itself. The fact that the permit fee requirements regulate somewhat more indirectly is not by itself fatal, for, like the essential permit requirements themselves, they remain "logically" and "genuinely" connected to obvious concerns. *Cf. CTTA II*, 693 F.3d at 860. CTTA points to no evidence suggesting an improper motivation for collecting permit fees. Rather, as CTTA appears to acknowledge, the City may only use the permit fees to administer the Permit System. In the absence of any showing that the permit fees are a hidden revenue-generating mechanism, or a pretext for some other sort of impermissible economic regulation, the Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to sections 3003 and 3053.

### 5. *Permittee Insurance Requirements: Sections 3052(6), 3056(5) & 3058*

Section 3052(6) requires tow-firm permit applicants to provide "[e]vidence of insurance at least equal to the minimum established in the Chief of Police rules." Section 3056(5) requires tow-firm permittees to maintain required levels of bodily injury and property damage insurance, on pain of permit revocation or suspension. Lastly, section 3058(a) requires permittees to provide proof of such insurance on a semiannual basis.

 These requirements fall squarely within the FAAAA's preservation of state and local authority "to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization." *See* 49 U.S.C. § 14501(c)(2)(A). CTTA complains that these provisions allow San Francisco to impose "different"—that is, higher—insurance requirements than those required by the state of California. CTTA MSJ at 19. CTTA concludes that this "contradicts the spirit of the FAAAA exemption," which Congress designed to "eliminate multiple and contradictory regulations by states . . . ." *Id.* (citing *Ours Garage*, 536 U.S. at 440, 122 S.Ct. 2226). Whatever the "spirit" of § 14501(c)(2)(A), its text preserves state regulatory authority with regard to minimum insurance coverage. And no careful reader of *Ours Garage* could miss that case's central holding "that § 14501(c)(2)(A) spares from preemption *local as well as state regulation.*" 536 U.S. at 442, 122 S.Ct. 2226 (emphasis added). Lest any doubt remain, *Ours Garage* specified that its holding applied to both the safety *and* the insurance aspects of § 14501(c)(2)(A). *See id.* There is no merit to CTTA's argument that the FAAAA preempts the Permit System's minimum insurance requirements.

The Court GRANTS the City's Motion, and DENIES CTTA's Motion, with respect to sections 3052(6), 3056(5), and 3058.

### 6. *Brochure Requirement: Section 3055.2*

Section 3055.2 requires tow firm operators to keep and conspicuously display brochures summarizing certain aspects of California towing law. This code section is unusual among those reviewed here in that it is the only section for which the Board articulated specific legislative findings, the same 2009 Findings discussed in Section

III.A.3. The findings are contained in paragraph (a) while the substance of the regulation is set forth in paragraphs (b) through (f). Paragraph (b) requires the brochure to present "a concise summary of California law, including the maximum rate that can be legally charged for a private property tow and the rights and responsibilities of all parties who participate in towing from private property: real property owners, vehicle owners, tow car operators and tow car firms." S.F. Police Code § 3055.2(b). The brochure must be displayed in Chinese, English, and Spanish, and "in a conspicuous place" where it will be seen by vehicle owners coming to reclaim their towed vehicles. *Id.* § 3055.2(c). Notably, the brochure must be made available "without assistance from" tow firm employees and before owners must pay their bill. *Id.* Funding for the brochure program comes from permit fees. *See id.* § 3055.2(e). The penalty for noncompliance with the brochure requirement is a $500 fine. *Id.* § 3055.2(f).

 The City argues that the brochure requirement is not subject to preemption in the first instance and that, even if it were, it would be saved by the safety exception and, at least partly, the price exception. City XMSJ at 17. The first part of the City's argument is incorrect. As CTTA points out, laws that require a motor carrier to provide a service that they otherwise would not are subject to FAAAA preemption. *See Rowe,* 552 U.S. at 376, 128 S.Ct. 989. The second part of the City's argument, however, is correct. The 2009 Findings strongly suggest that when the Board enacted the brochure requirement, it was concerned with several

things, and that motor vehicle safety was among them. *See generally* S.F. Police Code § 3052(a). For instance, the Board found that "there are frequent incidents of illegal towing from private property in San Francisco." *Id.* § 3052(a)(i). The Board identified a variety of difficulties that San Francisco visitors and residents might encounter when attempting to retrieve a towed car, including the imposition of large reclamation fees for autos that had been improperly towed in the first instance. *Id.* § 3052(a)(v). The brochure requirement is obviously aimed at discouraging improper towing and reducing tow firms' incentive to take advantage of the owners of towed vehicles (for instance, by demanding extortionate fees). Such legislation, "which tends to expedite recovery" of towed vehicles and prevent illegal tows, evinces a genuine motor vehicle safety concern. *Tillison,* 406 F.3d at 1130. Further, by explaining the rights and responsibilities of all involved, the brochure requirement aims to defuse conflicts over those rights and responsibilities before dangerous confrontations flare up and require police intervention. *See id.*

The Court concludes that the brochure requirement is genuinely responsive to motor vehicle safety.[12] Accordingly, the Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to the brochure requirement.

### 7. *Other Challenged Provisions*

The rest of the provisions challenged by CTTA bear less extensive discussion.

 Sections 3007 and 3056 both impose requirements that tow drivers and firms, respectively, display their permits at

---

**12.** CTTA derogates the City's justification of the brochure requirement as mere "consumer protection," and faults the City for failing to identify "a single iota of evidence" showing that the brochures effectively reduce "the perceived ills." CTTA Reply at 14–15. For the

reasons stated in Sections III.A.2 (consumer protection and motor vehicle safety motivations are compatible) and III.A.4 (no requirement for governments to produce evidence of legislative effectiveness), these objections lack merit.

all times. These requirements are not subject to FAAAA preemption because displaying a permit does not constitute a "service" within the meaning of 49 U.S.C. § 14501(c)(1). There is no market for the service of "displaying permits" and therefore no market conditions for the FAAAA to protect from local regulation. *See Rowe*, 552 U.S. at 373, 128 S.Ct. 989 (deeming preempted a state law that "[froze] in place and immunize[d] from competition a service-related system that carriers [did] not (or in the future might not) wish to provide"). The Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to sections 3007 and 3056.

Sections 3012 and 3064 make it a misdemeanor for tow drivers and firms, respectively, to fail to obtain the required permits. These sections survive CTTA's challenge because, even if they could be said to impact "service" by criminalizing failure to obtain a permit, they would be saved from preemption for all the reasons that the permit application and permit fee requirements—other "enabling" provisions—were saved. *See supra* Sections III.B.2, III.B.4. The Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to sections 3012 and 3064.

■. Section 3052(4) requires tow firm applicants to submit their business plans to the City. As a threshold matter, it is far from clear that the business-plan submission requirement falls within the preemptive scope of the FAAAA in the first instance, since nothing in the Permit System indicates that an unsatisfactory business plan could (1) constitute grounds for denial, suspension, or revocation of a tow firm permit or (2) require the applicant to change its manner of doing business. *See* S.F. Police Code §§ 3054 (grounds for denial), 3056 (grounds for suspension or revocation). Assuming *arguendo*, however,

that the business-plan submission requirement is subject to preemption, it would be saved by its obvious motor vehicle safety justification: In enacting this provision, the Board's palpable design was to allow SFPD to ascertain whether a permitted towing firm would be able to make ends meet without resorting to illegal means like, for example, overcharging for tows, or turning a license to tow cars into a license to steal them. As Sgt. Coggan's Declaration discreetly puts it, the business-plan disclosure requirement allows SFPD to "determine whether the amount charged by a tow company is commensurate with the services it regularly provides." Coggan Decl. ¶ 15. The business-plan disclosure requirement is both obviously and directly connected to motor vehicle safety and thus not preempted. The Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to section 3052(4)'s business-plan disclosure requirement.

■ Section 3052(4) also requires tow firms to establish "a system for handling complaints that is acceptable to the Chief of Police." This provision falls within the FAAAA's preemptive scope because it requires tow firms to provide the service of systematically handling complaints. *See Rowe*, 552 U.S. at 375–76, 128 S.Ct. 989 (FAAAA preempts statutes that "require motor carrier operators to perform certain services, thereby limiting their ability to provide incompatible alternative services" regardless of market conditions). The market, left to its own devices, might discourage tow firms from offering a complaint system, for example, to cut customer service costs. Nevertheless, the complaint-system requirement has at least two obvious motor vehicle safety rationales. First, having such a complaint system in place could reduce the incidence of heated confrontations between tow firm employ-

ees and drivers whose vehicles have been towed. Such a motivation is legitimately within the scope of "motor vehicle safety." *See Tillison,* 406 F.3d at 1130–31. Second, by diverting customer complaints to the tow firms, it reduces the likelihood that law enforcement will have to expend its own resources dealing with those complaints. *Id.* Sgt. Coggan's Declaration sets forth these two justifications, Coggan Decl. ¶ 16, and nothing suggests they are less than genuinely responsive to motor vehicle safety concerns. The Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to the complaint-system requirement of section 3052(4).

 Section 3060 requires each permit-bearing tow firm to "maintain a record of each vehicle towed," keep those records for three years, and make the records "available for inspection by any peace officer." This requirement constitutes a "service" under 49 U.S.C. § 14501(c)(1) because it requires towing firms to alter their manner of doing business in a manner not dictated by market forces. *See Rowe,* 552 U.S. at 375–76, 128 S.Ct. 989. However, the provision is saved by the motor vehicle safety exception. The provision is obviously motivated by a concern that, without such records, law enforcement's efforts to detect improper tows after the fact may be complicated or stymied altogether for lack of a paper trail. *Cf.* Coggan Decl. ¶ 20. CTTA presents no evidence to the contrary, instead faulting

section 3060 for being unresponsive to any "articulated" safety concern and for being a "consumer protection" law. CTTA MSJ at 21; CTTA Reply at 16. Neither of these arguments is persuasive. *See supra* Sections III.A.2–3. The Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to section 3060.

### 8. One Preempted Provision: Section 3056(2)

 The Court turns, finally, to the one provision in the Permit System that is preempted. Section 3056(2) authorizes SFPD to suspend or revoke the permit of any tow firm that imposes "towing, storage or other charges in excess of the maximum rate established by the [City] for its contracted tow car firms." This provision has the effect of transforming the City's contract rate for public property tows into a price cap for *all* tows, enforced by threat of revocation of the firm's permit. Thus, section 3056(2) clearly falls within the preemptive scope of 49 U.S.C. § 14501(c)(1) by regulating the price tow firms may charge. The question, then, is whether an exception saves it.

The City cites the FAAAA's "price" exception, 49 U.S.C. § 14501(c)(2)(C). That section, however, saves only those regulations related to the price of *non-consensual* tows.[13] Section 3056(2) does not distinguish between non-consensual and consensual tows and therefore caps

---

**13.** The FAAAA's price exception is not often litigated, but the few authorities that the Court has found are unanimous: § 14501(c)(2)(C) saves regulations relating to the price of non-consensual tows, but not those regulating the price of consensual tows. *See Ace Auto Body & Towing, Ltd. v. N.Y.C.,* 171 F.3d 765, 777–78 (2d Cir.1999) (city conceded regulation of prices of consensual tows to be preempted); *Helmrich Transp. Sys., Inc. v. City of Phila.,* No. Civ.A.02–2233, 2004 WL 2278534, at *6 (E.D.Pa. Oct. 8, 2004) (similar fee cap regulation preempted with respect to

consensual but not with respect to non-consensual tows); *Hous. Prof'l Towing Ass'n v. City of Hous.,* No. Civ.A. H–05–0323, 2005 WL 2121552, at *8 (S.D.Tex. Aug. 31, 2005) (stating without discussion that price of "a consent tow ... cannot be regulated"); *cf. Gregoire,* 424 F.3d at 1100 (turning aside preemption challenge from tower who conducted non-consensual tows in part on ground that FAAAA allows regulation of prices of those tows); *Indep. Towers of Wash. v. Wash.,* 350 F.3d 925, 931 (9th Cir.2003) (focusing on non-consensual towing).

the price of both. As such, it exceeds the protection of § 14501(c)(2)(C). Accordingly, the Court GRANTS CTTA's Motion and DENIES the City's Motion with respect to section 3056(2)'s cap on towing fees and deems that provision preempted by the FAAAA to the extent that it regulates the price firms may charge for *consensual* towing, storage, or ancillary services.[14]

 Because Article 30.1 of the Permit System contains a severability clause, S.F. Police Code § 3065, deeming section 3056(2) partly preempted requires the Court to address the severability issues identified in *CTTA II. See* 693 F.3d at 863. First, the Court must determine how much of section 3056(2) to sever. "Severability of a local ordinance is a question of state law." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 772, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). The parties apply to California law on this question. Under California law, an invalid provision must be severed if it is

> grammatically, functionally and volitionally separable [from the rest of the text].... It is grammatically separable if it ... can be removed as a whole without affecting the wording of any of the measure's other provisions. It is functionally separable if it is not necessary to the measure's operation and purpose. And it is volitionally separable if it was not of critical importance to the measure's enactment.

*Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, 21 Cal.4th 585, 613, 88 Cal.Rptr.2d 56, 981 P.2d 990 (1999) (internal quotation marks and citations omitted). Here, the Court strikes down section 3056(2) in its entirety because the preempted portion is not grammatically severable from the non-preempted portion. The provision regu-

lates the price of consensual and non-consensual tows alike, without making any distinction between them. Hence, the Court could not sever the preempted portion (relating to consensual tows) from the non-preempted portion (relating to non-consensual tows) without rewriting the ordinance. Accordingly, the Court ENJOINS the City from enforcing section 3056(2) in its entirety.

The next question is whether the Permit System can still stand without section 3056(2). *CTTA II*, 693 F.3d at 863. Quite obviously, it can, as both sides conceded at oral argument. Enjoining only section 3056(2) does not require this Court to disentangle a "complex regulatory web." *United States v. Manning*, 527 F.3d 828, 840 (9th Cir.2008). On the contrary, section 3056(2) is ancillary (at most) to the operation of the entire Permit System. The Court holds that the Permit System, minus section 3056(2), remains undisturbed.

### C. Application of Permit Scheme to Consensual Towing

In *CTTA I*, this Court held that the Permit System, taken as a whole, was preempted to the extent the City sought to enforce it against pass-through towers and consensual towers, but not preempted to the extent the City enforced it against non-consensual towers. 2010 WL 5071602, at *1. On appeal, the Ninth Circuit described the Court as having failed to address "an open issue—whether a federal law can ever preempt state law on an 'as applied' basis, that is, whether it is proper to find that federal law preempts a state regulatory scheme sometimes but not at other times, or that a federal law can preempt state law when applied to certain

---

14. Section 14501(c)(2)(C) refers to "transportation," which the FAAAA defines broadly to include not only towing but "storage." *See*

49 U.S.C. § 13102(23); *Ware v. Tow Pro Custom Towing & Hauling, Inc.*, 289 Fed.Appx. 852, 856 (6th Cir.2008).

parties, but not to others." *CTTA II*, 693 F.3d at 865. The Ninth Circuit directed this Court to consider on remand "whether it can resolve the preemption questions without analyzing them on an 'as applied' basis, and if not, whether further briefing is necessary." *Id.* The Court determines that it need not analyze any of the challenged provisions on an "as applied" basis. Each of the challenged provisions of the Permit System that survives preemption analysis does so whether it is considered in the context of consensual or non-consensual tows. And, as the Court just explained, the one preempted provision, section 3056(2), is preempted in both the consensual and non-consensual contexts due to its lack of severability.

In its earlier opinion, the Court explained that it understood the first step of the motor-vehicle safety exception analysis to limit it to "review[ing] legislative expressions of intent and then determin[ing] whether the regulation fairly serves to address the identified safety concerns." *CTTA I*, 2010 WL 5071602, at *5. The Court then examined only independent legislative expressions of intent that it had before it—the 2009 Findings. The Court identified in those findings a concern for the safety impacts of non-consensual tows, but not for consensual or pass-through tows. Accordingly, the Court held that the Permit System went too far when it regulated in those areas. The *CTTA II* court suggested, however, that this Court went awry when it limited its inquiry to the 2009 Findings. The Ninth Circuit explained that the Court need not limit its review to formal expressions of legislative intent to the exclusion of the plain language of the challenged code sections and their subject matter. *See CTTA II*, 693 F.3d at 864–65.

The Court has remained mindful of that guidance while analyzing each of the challenged provisions. In doing so, the Court has concluded that several of the challenged provisions are not subject to FAAAA preemption in the first instance. As for the provisions that are subject to FAAAA preemption, with only two exceptions,[15] they are saved by the motor vehicle safety exemption for reasons that apply in the consensual towing context as well as the non-consensual. For instance, a number of the challenged provisions seek to weed out potential criminals from the towing industry; in so doing so, they evince a concern with safeguarding the financial safety of parties who may divulge their sensitive financial information to tow drivers and tow firms. Both consensual and non-consensual tows require the exchange of financial information. The challenged provisions also evince a concern for the bodily safety of persons who, in the case of consensual tows, will find themselves interacting with drivers roadside and sometimes riding in the cab alongside them. Other provisions are "enabling" provisions that allow the basic requirement of a permit to operate, with its attendant screening and deterrent effects. Yet other provisions, such as the requirement of an acceptable complaint system and the brochure requirement, are equally justified by motor vehicle safety concerns whether the underlying nature of the tow is consensual or non-consensual; time-consuming and potentially dangerous disputes can break out even amongst willing parties to a transaction.

CTTA, for its part, identifies no evidence to suggest that the motor vehicle safety or other identified exceptions possess any less force in the consensual context. Rather, CTTA suggests that the

---

**15.** The two exceptions are the minimum insurance requirements, which are saved from preemption by 49 U.S.C. § 14501(c)(2)(C), and section 3056(2), which is preempted.

Board's expressions of intent in the 2009 Findings somehow matter more than the legislative intent obviously discernible in the text of the Permit System as enacted. *See* CTTA Reply at 17. That suggestion is misplaced. Nothing in *CTTA II* implies that articulated legislative findings appended to a law are more probative of legislative intent than the law itself. *See* 693 F.3d at 864–65. On the contrary, *CTTA II* observed that the 2009 Findings offer questionable proof at best of what the Board intended when passing earlier-enacted provisions of the Permit System. *Id.* at 861.

In the absence of any showing by CTTA through evidence or argument that some principled reason exists to strike down particular provisions of the Permit System as applied to consensual tows, the Court declines to do so.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the City's Motion and denies CTTA's Motion, except with respect to section 3056(2), which imposes a rate cap on all towing conducted in San Francisco. With respect to section 3056(2), the Court GRANTS CTTA's Motion and DENIES the City's Motion. The Court SEVERS section 3056(2) and ENJOINS its enforcement. Because severing section 3056(2) does not so disable the Permit System as to impede its continued enforcement, the rest of the Permit System remains undisturbed.

**IT IS SO ORDERED.**